101 Cal.Rptr.2d 653 (2000)
24 Cal.4th 537
12 P.3d 1068
HI-VOLTAGE WIRE WORKS, INC., et al., Plaintiffs and Respondents,
v.
CITY OF SAN JOSE et al., Defendants and Appellants.
No. S080318.
Supreme Court of California.
November 30, 2000.
*654 Richard Doyle, City Attorney, George Rios, Assistant City Attorney, Glenn D. Schwarzbach and Robert Fabela, Deputy City Attorneys; and Joan R. Gallo for Defendants and Appellants.
Bill Lann Lee, Acting Assistant Attorney General, Stuart J. Ishimaru, Deputy Assistant Attorney General, Mark L. Gross and Lisa W. Edwards, Dist. of Columbia, for United States as Amicus Curiae on behalf of Defendants and Appellants.
Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Louis Verdugo, Jr., Assistant Attorney General, and Marjorie Cox, Deputy Attorney General, for State of California as Amicus Curiae on behalf of Defendants and Appellants.
Louise H. Renne, City Attorney, Randy Riddle, Mara E. Rosales, Ellen M. Forman and Teresa L. Strieker, Deputy City Attorneys; Moscone, Emblidge & Quadra and G. Scott Emblidge for City and County of San Francisco, County of Alameda, County of Marin, County of Sacramento, City of Albany, City of Berkeley, City of Hayward, City of Los Angeles, City of Oakland, City of Redlands, City of Sacramento, City of San Pablo and the East Bay Municipal Utility District as Amici Curiae on behalf of Defendants and Appellants.
Morrison & Foerster, Alan Cope Johnston, Su W. Hwang, Cynthia L. Lopez, Katherine A. Zonana, Sharyn K. Funamura, Palo Alto, and Lia B. Epperson, for United Minority Business Entrepreneurs, *655 Santa Clara County Black Chamber of Commerce, Coalition for Economic Equity and Tradeswomen, Inc., as Amici Curiae on behalf of Defendants and Appellants.
Beth H. Parker; Eva J. Peterson and Oren Sellstrom, Woodland, for Dr. Mary Frances Berry, Cruz Reynoso, Christopher J. Edley, Jr., Elsie Meeks and Yvonne Y. Lee, Commissioners for the U.S. Commission on Civil Rights, Equal Rights Advocates, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, American Civil Liberties Union Foundation of Northern California, American Civil Liberties Union Foundation of Southern California, Employment Law Center, Mexican American Legal Defense and Educational Fund and California Minority Counsel Program as Amici Curiae on behalf of Defendants and Appellants.
Elaine R. Jones, Washington, DC, Theodore M. Shaw, Norman J. Chachkin, Melissa Woods, Erica J. Teasley; and Pamela S. Karlan for NAACP Legal Defense and Educational Fund, Inc., as Amicus Curiae on behalf of Defendants and Appellants.
Lora Jo Foo, Khin Mai Aung, San Francisco; Karen K. Narasaki, Aryani Ong; Crowell & Moring, J. Michael Klise, Andy Liu, Miguel Del Toro, Washington, DC; Stewart Kwoh, Los Angeles, Julie A. Su; Sin Yen Ling and Ken Kimerling for National Asian Pacific American Legal Consortium, Asian Law Caucus and Asian American Contractors Association as Amici Curiae on behalf of Defendants and Appellants.
Horvitz & Levy, David S. Ettinger, Encino, and Jon B. Eisenberg, Oakland, for Mission Hiring Hall, Visitation Valley Jobs Education and Training, Asian Neighborhood Design, Chinese for Affirmative Action, Ella Hill Hutch Community Center and Young Community Developers as Amici Curiae on behalf of Defendants and Appellants.
Edward Chen for American Civil Liberties Union Foundation for Northern California as Amicus Curiae on behalf of Defendants and Appellants.
William McNeill III and Julian Gross, San Francisco, for Employment Law Center as Amicus Curiae on behalf of Defendants and Appellants.
Pacific Legal Foundation, John H. Findley, Sharon L. Browne, Sacramento, Deborah J. La Fetra, Stephen R. McCutcheon, Jr., and Mark T. Gallagher, Sacramento, for Plaintiffs and Respondents.
Kevin T. Snider, Gary G. Kreep, Escondido, and William G. Gillespie for United States Justice Foundation as Amicus Curiae on behalf of Plaintiffs and Respondents.
Losch & Ehrlich and Ronald K. Losch, San Francisco, for HSQ Technology as Amicus Curiae on behalf of Plaintiffs and Respondents.
Simpson, Aherne & Garrity, San Mateo, and Pamela A. Lewis for J. Jack Bras and doing business as J. Jack Bras & Associates as Amici Curiae on behalf of Plaintiffs and Respondents.
Roger Clegg and David A. DeGroot, Austin, TX, for Glynn Custred and Thomas E. Wood as Amici Curiae on behalf of Plaintiffs and Respondents.
Patrick J. Manshardt; Law Offices of Manuel S. Klausner and Manuel S. Klausner, Los Angeles, for American Civil Rights Institute, Ward Connerly and Governor Pete Wilson as Amici Curiae on behalf of Plaintiffs and Respondents.
BROWN, J.
"In the history of this Court and this country, few questions have been more divisive than those arising from governmental action taken on the basis of race." (Fullilove v. Klutznick (1980) 448 U.S. 448, 516, 100 S.Ct. 2758, 65 L.Ed.2d 902 (cone, opn. of Powell, J.); see also DeFunis v. Odegaard (1974) 416 U.S. 312, 350, 94 S.Ct. 1704, 40 L.Ed.2d 164 (dis. opn. of Brennan, J.).) In November 1996, the California voters added yet another chapter to the long and tortuous history of this *656 question when they approved Proposition 209, which amended our Constitution to prohibit the state and its political subdivisions from "discriminating] against, or granting] preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." (Cal. Const., art. I, § 31.) Subsequent to the approval of Proposition 209, the City of San Jose adopted a program that requires contractors bidding on city projects to utilize a specified percentage of minority and women subcontractors or to document efforts to include minority and women subcontractors in their bids.
The question before the court is whether this program contravenes article I, section 31 of the California Constitution. Although the precise issue is a narrow one, the electorate did not approve Proposition 209 in a vacuum. Quite the contrary. Thus, while it may be possible to resolve the matter, as do the Chief Justice and Justice Kennard, simply by relying on differences between Proposition 209 and title VII of the Civil Rights Act of 1964 or on the plain meaning of the initiative's language, we can discern and thereby effectuate the voters' intention only by interpreting this language in its historical context. Viewing the provisions of article I, section 31 from this perspective, it is clear the voters intended to adopt the original construction of the Civil Rights Act and prohibit the kind of preferential treatment accorded by this program.

FACTUAL AND PROCEDURAL BACKGROUND
The salient facts, which are not in dispute, are drawn from the opinion of the Court of Appeal. In 1983, the City of San Jose (City) established a program to encourage public works projects participation by minority business enterprises (MBE's) and women business enterprises (WBE's).[1] For each contract, the City set a "participation goal" based on the "availability and ability of the MBE and WBE to do the work to be contracted." To qualify as a "responsible bidder," a contractor had to meet or exceed this goal or demonstrate "reasonable efforts" to obtain MBE/WBE participation. "Reasonable efforts" entailed documenting written notice to at least four MBE's/WBE's soliciting them for the project, follow-up contact to determine their interest in bidding, and written reasons justifying rejection of an MBE's or WBE's low bid.
In 1989, the United States Supreme Court held in City of Richmond v. J.A Croson Co. (1989) 488 U.S. 469, 498-507, 109 S.Ct. 706, 102 L.Ed.2d 854 (Croson), that a state government could not implement a program designed to remedy past discrimination absent a factual predicate substantiating an inference of prior discriminatory exclusion. Following Croson, in 1990 the City suspended its MBE/WBE program and commissioned a study to identify any statistically significant disparity in the number and dollar value of contracts and subcontracts awarded to MBE's and WBE's. The resulting report established such a disparity as to the amount of contract dollars awarded MBE subcontractors. In response, the City adopted the "MBE/WBE Construction Program" to encourage nondiscriminatory subcontracting. Like its predecessor, the new program included participation goals and required documentation of good faith efforts to meet them.
After the passage of Proposition 209, the City's Office of Affirmative Action/Contract Compliance became the Office of Equality Assurance. The City also adopted the Nondiscrimination/Nonpreferential Treatment Program Applicable to Construction Contracts in Excess of $50,000 (Program) at issue here. The Program reaffirms the findings of the 1990 *657 disparity study and attempts to clarify the City's policy of nondiscrimination and nonpreference in the subcontracting of its construction projects to "ensure that the historical discrimination does not continue."[2]
As with the 1983 version, the Program requires contractors bidding on City projects to fulfill either an outreach or a participation component. The "Documentation of Outreach" option entails maintaining records of written notice, or "solicitation letters," to four certified MBE's/ WBE's for each trade area identified for the project. Copies of the notice or letters must accompany the bid. The contractor must document at least three attempts to contact the MBE/WBE firms to determine their interest in participating in the project. If any MBE's/WBE's express interest, the contractor must negotiate in good faith. It may not unjustifiably reject any bids prepared by MBE's/WBE's and must specify the reasons for doing so.[3] With respect to the "Documentation of Participation" option, the City determines for each project the number of MBE/WBE subcontractors that would be expected in the absence of discrimination. If a contractor lists a sufficient number of MBE's/WBE's in the bid to meet this "evidentiary presumption" of nondiscrimination, it will satisfy the participation alternative, and the City will not require any documentation of outreach.
A bid failing to document either MBE/WBE outreach or participation is rejected as "nonresponsive," and the contractor is deemed not a "responsible" bidder. The Program's requirements apply to all contractors, including MBE's, WBE's, and those not planning to subcontract any portion of the project.
In 1997, the City solicited bids on a project for which plaintiff Hi-Voltage Wire Works, Inc. (Hi-Voltage), a general contracting firm, was the low bidder. Because it intended to utilize entirely its own work force, it failed to comply with either the MBE/WBE outreach or participation requirement. The City therefore rejected its bid. Joined by plaintiff Allen Jones, a City taxpayer, Hi-Voltage initiated this litigation challenging the Program as a violation of article I, section 31 of the California Constitution (section 31) because it required contractors to accord "unlawful preferences" to minority and women subcontractors by giving them "special assistance and information" not provided non-MBE/WBE subcontractors. Plaintiffs sought declaratory relief and an injunction preventing continuation of the Program. The trial court granted plaintiffs' motion for summary judgment, finding that both components of the Program constituted race- and sex-based classifications that violated section 31.
The Court of Appeal affirmed. Considering the language of section 31 in light of the ballot materials accompanying Proposition 209, the court concluded "that the term `preferential treatment' ..., viewed in its ordinary, natural sense, refers to any kind of treatment favoring one group or individual over another. The prohibition is not limited to set-asides, quotas, and 'plus factors,' but extends to all preferences granted to the target groups. [Fn. omitted.]" The court found section 31, as thus defined, invalidated the Program's MBE/WBE outreach option because it does more than "encourag[e] contractors to include MBE/WBE's in soliciting subcontractor bids." It requires them "to *658 give personal attention to and consideration of minority and women businesses that need not be given to non-MBE/WBE's. Furthermore, the contractor may not `unjustifiably reject as unsatisfactory bids prepared by any [MBE's/WBE's].' This requirement alone grants a distinct preference to MBE/WBE businesses."
With respect to the participation option, the court determined the evidentiary presumption established an impermissible goal for including MBE/WBE firms in a contractor's bid. It found unpersuasive the City's contention that the evidentiary presumption is not discriminatory or preferential because its purpose is "only to 'screen' for discrimination, `not to have contractors achieve some predetermined objective'...." In the court's view, "[neither the text of Proposition 209 nor its accompanying ballot materials suggest that a violation occurs only when the government intentionally discriminates or grants preferences."
We granted the City's petition for review to settle this important question of state constitutional law. To properly measure the relevant analytical context, we trace back almost 150 years before the passage of Proposition 209 and find recurring patterns in the law as to the appropriate role of government concerning questions of race.[4] This extended perspective both illuminates the meaning and purpose of Proposition 209 and guides its application.

DISCUSSION

I

A
The United States was founded on the principle that "all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are life, liberty, and the pursuit of happiness." (Declaration of Independence.) Yet, our history reflects a continuing struggle to enable every individual to fully realize this "self-evident" article of faith. (See University of California Regents v. Bakke (1978) 438 U.S. 265, 387-395, 98 S.Ct. 2733, 57 L.Ed.2d 750 (cone. & dis. opn. of Marshall, J.) (Bakke II).) That struggle demarcates the historical and cultural context within which we decide the issue before us.
While the courts have been instrumental in effecting positive change in the quest for equality, their involvement in articulating a coherent vision of the civil rights guaranteed by our Constitution has not been without its low points. (See McCleskey v. Kemp (1987) 481 U.S. 279, 343-344, 107 S.Ct. 1756, 95 L.Ed.2d 262 (dis. opn. of Brennan, J.); Fullilove v. Klutznick, supra, *659 448 U.S. at p. 516, 100 S.Ct. 2758 (cone. opn. of Powell, J.).) The nadir was perhaps the Dred Scott decision, in which the United States Supreme Court denied citizen status to African Americans, "whether emancipated or not." (Dred Scott v. Sandford (1856) 60 U.S. (19 How.) 393, 405, 15 L.Ed. 691 (Dred Scott).) The true vice of Dred Scott lies not so much in the fact it "treated prohibition of slavery in the Territories as nothing less than a general assault on the concept of property." (Washington v. Glucksberg (1997) 521 U.S. 702, 770, 117 S.Ct. 2258, 138 L.Ed.2d 772 (cone. opn. of Souter, J.); see Dred Scott, supra, 60 U.S. at pp. 449-452.) Rather, a majority of the United States Supreme Court endorsed the then-prevailing societal view that African-Americanswhether slave or freewere "altogether unfit to associate with the white race, either in social or political relations"; and "had no rights which the white man was bound to respect." (Dred Scott, supra, 60 U.S. at p. 407; cf. People v. Hall (1854) 4 Cal. 399, 404-05 [holding as a matter of "public policy" under state statute that Chinese, "a race of people whom nature has marked as inferior," were precluded from testifying against White persons].) In legitimating this pernicious concept, the court set the stage not only for the cataclysm of the Civil War but for the contentiousness that continues to this day over government's proper role with respect to race.
Following the Civil War, Congress overturned the Dred Scott decision when it adopted the Fourteenth Amendment expressly defining citizenship and forbidding any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." Nevertheless, in Plessy v. Ferguson (1896) 163 U.S. 537, 552,16 S.Ct. 1138, 41 L.Ed. 256 (Plessy), the Supreme Court validated government-initiated racial restrictions and gave its imprimatur to legally enforced segregation on the theory that "[i]f one race be inferior to the other socially, the Constitution of the United States cannot put them upon the same plane." The court approved "separate but equal" (ibid. (dis. opn. of Harlan, J.)) accommodations as a valid exercise of the state's "police power" to prevent racial strife. (Id. at p. 544, 16 S.Ct. 1138.) Although speaking only for himself at the time, Justice Harlan vigorously dissented: "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." (Id. at p. 559, 16 S.Ct. 1138 (dis. opn. of Harlan, J.).) "The destinies of the two races, in this country, are indissolubly linked together, and the interests of both require that the common government of all shall not permit the seeds of race hate to be planted under the sanction of law." (Id. at p. 560, 16 S.Ct. 1138 (dis. opn. of Harlan, J.).)
Justice Harlan's view would not prevail for more than half a century. But, in Brown v. Board of Education (1954) 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, a unanimous Supreme Court acknowledged the invidious effect of separating individuals solely because of their race. "`The impact is greater when it has the sanction of the law....'" (Id. at p. 494, 74 S.Ct. 686.) Repudiating Plessy, the court concluded that "in the field of public education the doctrine of `separate but equal' has no place. Separate educational facilities are inherently unequal [and] deprive[ ] [those affected] of the equal protection of the laws guaranteed by the Fourteenth Amendment." (Id. at p. 495, 74 S.Ct. 686.)
Brown v. Board of Education, supra, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, concerned state-imposed segregation in education, but the courts did not hesitate to apply its animating principle in other contexts. (See Van Alstyne, Rites of Passage: Race, the Supreme Court, and the Constitution (1979) 46 U. Chi. L.Rev. 775, 783, fn. 24, and cases cited therein (Van Alstyne).) In summarizing the common thread of these cases, Professor Van Alstyne observed that in the years between 1955 and 1976 following Brown v. Board of Education, supra, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, "virtually every other *660 race-related decision by the Supreme Court appeared to convey" Justice Harlan's conviction "that the Civil War amendments altogether `removed the race line from our governmental systems.'" (Van Alstyne, supra, 46 U. Chi. L.Rev. at p. 783.) "To the reasonably discerning, this appeared true even in instances involving highly controversial judicial decrees that paired racially identifiable schools, redrafted attendance lines, or mandated busing. In each instance, the fulcrum of judicial leverage was an existing governmental race line, which the particular judicial order sought to remove. The object was thus to disestablish particular, existing uses of race, not to establish new ones." (Id. at pp. 783-784, fn. omitted.)
Although a landmark decision, Brown v. Board of Education was not singular. Both before and after, the United States Supreme Court was actively developing a "color-blind" jurisprudence. Hughes v. Superior Court of California (1950) 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 involved an injunction against picketers seeking to have a supermarket hire African-American grocery clerks at a particular location proportionate to the number of African-American customers at that store. This court upheld a judgment of contempt for violation of the injunction, and the high court affirmed. The picketers had claimed a deprivation of due process for infringement of their right to free speech. The Supreme Court rejected the argument, noting "that it would encourage discriminatory hiring to give constitutional protection to petitioners' efforts to subject the opportunity of getting a job to a quota system." (Id. at p. 463, 70 S.Ct. 718; cf. DeFunis v. Odegaard, supra, 416 U.S. at p. 336, 94 S.Ct. 1704 (dis. opn. of Douglas, J.) ["There is no constitutional right for any race to be preferred"].)
In Peterson v. Greenville (1963) 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323, the high court struck down a city ordinance requiring restaurant and hotel proprietors to maintain segregated facilities. When a state "passes a law compelling persons to discriminate against other persons because of race," it commits "a palpable violation of the Fourteenth Amendment...." (Id. at p. 248, 83 S.Ct. 1119.) Reitman v. Mulkey (1967) 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 concerned a state constitutional amendment that, while facially neutral, encouraged and facilitated racial discrimination in the rental and sale of residential property. As in analogous decisions, the state had violated the right of equal protection because it "had taken affirmative action designed to make private discriminations legally possible." (Id at p. 375, 87 S.Ct. 1627.)[5]
Professor Alexander Bickel referred to these cases as "the great decisions of the Supreme Court" whose lesson "and the lesson of contemporary history have been the same for at least a generation: discrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society." *661 (Bickel, The Morality of Consent (1975) p. 133 (Bickel).) For Professor Van Alstyne, "the message is commendably even stronger. Laws that divide and index people to measure their civil rights by race are unconstitutional. Laws that encourage others to do so are similarly invalid. And laws attempting to advance either policy even in disguise will likewise be struck down whenever it is within the capacity of conscientious courts to see beneath their cellophane wrappers." (Van Alstyne, supra, 46 U. Chi. L.Rev. at p. 792, fn. omitted.)

B
Although the United States Supreme Court had rejected the principle of separate but equal and had directed the admission of students to public schools "on a racially nondiscriminatory basis with all deliberate speed" (Brown v. Board of Education (1955) 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083), many officials charged with implementing the mandate were reluctant if not recalcitrant. Discrimination remained the norm generally, prompting protests and acts of civil disobedience. (See, e.g., Peterson v. Greenville, supra, 373 U.S. 244, 83 S.Ct. 1119.) In response, Congress enacted the Civil Rights Act of 1964 (Civil Rights Act or Act). As the floor debates and committee reports attest, Congress intended that the Act reflect Justice Harlan's understanding of the Constitution and "be `colorblind' in its application." (Bakke II, supra, 438 U.S. at p. 415, 98 S.Ct. 2733, fn. omitted (cone. & dis. opn. of Stevens, J.); see Steelworkers v. Weber (1979) 443 U.S. 193, 229-252, 99 S.Ct. 2721, 61 L.Ed.2d 480 (dis. opn. of Rehnquist, J.) [detailing legislative history of title VII of the Act].)
Title VII of the Civil Rights Act (Title VII) forbids, with limited exceptions, discrimination in employment on the basis of race, color, religion, sex, or national origin.[6] Because section 31 closely parallels this provision in both language and purpose, the next phase in developing our historical context concerns the analytical and philosophical evolution in the interpretation and application of Title VII.
The Supreme Court first considered an alleged violation of Title VII in Griggs v. Duke Power Co. (1971) 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (Griggs). African-American workers claimed a racially neutral hiring and promotion criterion unrelated to any job requirement discriminated against them in its actual effect. In a unanimous opinion by Chief Justice Burger, the high court agreed: "The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities...." (Id. at p. 429, 91 S.Ct. 849; see also Teamsters v. United States (1977) 431 U.S. 324, 335, 97 S.Ct. 1843, 52 L.Ed.2d 396, fn. 15 (Teamsters).) To that end, the Act prohibited "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." (Griggs, supra, 401 U.S. at p. 431, 91 S.Ct. 849.) Nevertheless, the court stressed, "Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications.... Discriminatory preference for any group, minority or majority, is precisely *662 and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." (Id. at pp. 430-431, 91 S.Ct. 849.)
Equally clear in the court's view, "Title VII ... prohibits the discharge of `any individual' because of `such individual's race,' [citation]. Its terms are not limited to discrimination against members of any particular race." (McDonald v. Santa Fe Trail Transp. Co. (1976) 427 U.S. 273, 278-279, 96 S.Ct. 2574, 49 L.Ed.2d 493, fn. omitted (McDonald); see ante, 101 Cal. Rptr.2d at p. 661, fn. 6, 12 P.3d at p. 1075, fn. 6.) "This conclusion is in accord with uncontradicted legislative history to the effect that Title VII was intended to `cover white men and white women and all Americans,' [citation], and create an `obligation not to discriminate against whites,' [citation]." (McDonald, at p. 280, 96 S.Ct. 2574.) Accordingly, regardless of the complainant's race, the "same standards" prohibiting employment discrimination applied. (Ibid.)[7]
Regarding appropriate relief for Title VII violations, the court reaffirmed in Teamsters, supra, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, that "[a]n equally important purpose of the Act is `to make persons whole for injuries suffered on account of unlawful employment discrimination.' [Citation.] In determining the specific remedies to be afforded, a district court is `to fashion such relief as the particular circumstances of a case may require to effect restitution.' [Citation.]" (Id. at p. 364, 97 S.Ct. 1843.) Consistent with the broad equitable powers conferred by Congress, Title VII courts may even, under limited circumstances, award seniority to persons who had never actually applied for a job. "A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection." (Teamsters, at p. 365, 97 S.Ct. 1843.) Such a violation may not be unduly attenuated, however. The claimant must "show that he was a potential victim of unlawful discrimination" and discharge "the not always easy burden of proving that he would have applied for the job had it not been for those practices. [Citation.]" (Id. at pp. 367-368, 97 S.Ct. 1843.)
The court cautioned, however, that "Title VII ... does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees." (Furnco Construction Corp. v. Waters (1978) 438 U.S. 567, 577-578, 98 S.Ct. 2943, 57 L.Ed.2d 957 (Furnco).) "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for each applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force. [Citations.]" (Id. at p. 579, 98 S.Ct. 2943.) Thus, "courts may not impose such a remedy on an employer at least until a violation of Title VII has been proved...." (Id. at p. 578, 98 S.Ct. 2943.)
The Supreme Court's early interpretation of Title VII emphasized several factors: The purpose of Title VII was to ensure equal opportunity for all. Thus, discriminatory practices were forbidden irrespective of the victim's race. Relief could, take the form of restitution to individual victims, including those establishing *663 that an employer's pattern and practice of discrimination deterred their applications for employment. It could also be remedial, to eradicate the effects of specific discriminatory practices, but courts had no obligation or authority to require any particular affirmative hiring or other employment practices. In other words, consistent with congressional intent, the court's construction confirmed and reinforced the role of government as color-blind in these matters.

C
The analytical framework of Title VII jurisprudence underwent substantial modification in 1979 when the United States Supreme Court decided Steelworkers v. Weber, supra, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (Weber). In Weber, the employer voluntarily instituted a training program as part of an effort to eliminate a conspicuous racial imbalance in its craftworkers. Selection for the program was based on seniority, with the proviso that at least half of the trainees chosen be African Americans "until the percentage of black skilled craftworkers in the ... plant approximated the percentage of blacks in the local labor force." (Id. at p. 199, 99 S.Ct. 2721.) A White employee who had been denied entry despite greater seniority than some African-Americans admitted into the program brought suit under Title VII. A majority of the court found no violation. "Examination of [the legislative history of Title VII and the historical context from which the Act arose] makes clear that an interpretation ... that forbade all race-conscious affirmative action would `bring about an end completely at variance with the purpose of the statute' and must be rejected. [Citations.]" (Weber, at pp. 201-202, 99 S.Ct. 2721.) Because "Congress' primary concern in enacting the prohibition against racial discrimination in Title VII of the Civil Rights Act of 1964 was with `the plight of the Negro in our economy'" (Weber, at p. 202, 99 S.Ct. 2721) and "private and voluntary affirmative action efforts [were] one method of solving this problem" (id. at p. 203, 99 S.Ct. 2721), Congress could not have meant to ban them absolutely. (Id. at p. 206, 99 S.Ct. 2721.) The court further interpreted Title VII to permit race-conscious action "whenever the job category in question is `traditionally segregated.' [Citation.]" (Weber, at p. 212, 99 S.Ct. 2721 (cone. opn. of Blackmun, J.).)
Although concurring, Justice Blackmun admitted, "The Court's expansive approach is somewhat disturbing for me because, as Mr. Justice Rehnquist points out, the Congress that passed Title VII probably thought it was adopting a principle of nondiscrimination that would apply to blacks and whites alike. While setting aside that principle can be justified where necessary to advance statutory policy by encouraging reasonable responses as a form of voluntary compliance that mitigates `arguable violations,' discarding the principle of nondiscrimination where no countervailing statutory policy exists appears to be at odds with the bargain struck when Title VII was enacted." (Weber, supra, 443 U.S. 193, 212-213, 99 S.Ct. 2721, 61 L.Ed.2d 480 (cone. opn. of Blackmun, J.).) Justice Blackmun also expressed concern that under the majority's rule, "[t]he individual employer need not have engaged in discriminatory practices in the past." (Id. at p. 213, 99 S.Ct. 2721.) Nevertheless, he discerned some analytical support for the result and concluded that "if the Court has misperceived the political will, it has the assurance that because the question is statutory Congress may set a different course if it so chooses." (Id. at p. 216, 99 S.Ct. 2721; but see DeRonde v. Regents of University of California (1981) 28 Cal.3d 875, 902, fn. 6, 172 Cal.Rptr. 677, 625 P.2d 220 (dis. opn. of Mosk, J.) (DeRonde); Johnson v. Transportation Agency (1987) 480 U.S. 616, 671-672, 107 S.Ct. 1442, 94 L.Ed.2d 615 (dis. opn. of Scalia, J.) (Johnson).)
Chief Justice Burger and then-Justice Rehnquist dissented. The Chief Justice *664 criticized the majority's apparent reversal of settled law: "Until today, I had thought the Court was of the unanimous view that '[discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed' in Title VII." (Weber, supra, 443 U.S. 193, 218, 99 S.Ct. 2721, 61 L.Ed.2d 480 (dis. opn. of Burger, C.J.), quoting Griggs, supra, 401 U.S. at p. 431, 91 S.Ct. 849.) In his view, the legislative history established that the Civil Rights Act "was conceived and enacted to make discrimination against any individual illegal, and I fail to see how 'voluntary compliance' with the no-discrimination principle that is the heart and soul of Title VII as currently written will be achieved by permitting employers to discriminate against some individuals to give preferential treatment to others." (Weber, at p. 218, 99 S.Ct. 2721.)
Justice Rehnquist recounted the numerous cases in which the court had "never wavered in our understanding that Title VII `prohibits all racial discrimination in employment, without exception for any group of particular employees.' [Citation.]" (Weber, supra, 443 U.S. 193, 220, 99 S.Ct. 2721, 61 L.Ed.2d 480 (dis. opn. of Rehnquist, J.), quoting McDonald, supra, 427 U.S. at p. 283, 96 S.Ct. 2574.) He also exhaustively analyzed extensive portions of Title VII's legislative history supporting that understanding. (Weber, at pp. 226-254, 99 S.Ct. 2721.) For example, "Senator Humphrey [one of the bipartisan floor managers of the entire civil rights bill in the Senate] ... stated that `nothing in the bill would permit any official or court to require any employer or labor union to give preferential treatment to any minority group.' [Citation.]" (Id. at p. 237, 99 S.Ct. 2721, fn. omitted.)[8] Senator Kuchel, the other bipartisan floor manager explained: "`Employers and labor organizations could not discriminate in favor of or against a person because of his race, his religion, or his national origin. In such matters ... the bill now before us ... is color-blind.' [Citation.]" (Weber, at p. 238, 99 S.Ct. 2721.) As its proponents emphasized, the Act "`provides no preferential treatment for any group of citizens. In fact, it specifically prohibits such treatment.' [Citation.]" (Id. at p. 248, 99 S.Ct. 2721, fn. omitted.)
In the wake of Weber, Title VII jurisprudence underwent a sea change in less than a decade (see Johnson, supra, 480 U.S. 616, 642-643, 107 S.Ct. 1442, 94 L.Ed.2d 615 (cone. opn. of Stevens, J.)), from providing individualized restitutionary relief for specific injury to approving race-conscious practices by court order or employer-initiated programs.[9] (Compare, *665 e.g., Teamsters, supra, 431 U.S. at pp. 342-343, fn. 24, 346-347, 356-362, 374-375, fn. 61, 97 S.Ct. 1843, with, e.g., Sheet Metal Workers v. EEOC (1986) 478 U.S. 421, 445, 106 S.Ct. 3019, 92 L.Ed.2d 344 (Sheet Metal Workers).) Having once validated consideration of race, the United States Supreme Court struggled to articulate a principled, consistent standard for doing so given its earlier construction of Title VII. (See also Adarand, supra, 515 U.S. at pp. 212-231, 115 S.Ct. 2097 [reflecting similar difficulty developing coherent principles for consistently resolving equal protection challenges to race-based actions].)
For example, in Sheet Metal Workers, supra, 478 U.S. at page 445, 106 S.Ct. 3019, the court determinedover contrary arguments by the Equal Employment Opportunity Commissionthat Title VII "does not prohibit a court from ordering, in appropriate circumstances, affirmative race-conscious relief [in the form of fixed union membership goals] as a remedy for past discrimination" even if it may benefit individuals who were not identified victims of such discrimination. (See also Firefighters v. Cleveland (1986) 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 [consent decree requiring race-conscious promotions did not violate Title VII even though beneficiaries had not suffered discrimination].) In reaching this result, a plurality of the court construed Title VII not only to guarantee equal employment opportunities but to "foster" them as well. (Sheet Metal Workers, supra, 478 U.S. at p. 448, 106 S.Ct. 3019.) "[E]ven where the employer or union formally ceases to engage in discrimination, informal mechanisms may obstruct equal employment opportunities. An employer's reputation for discrimination may discourage minorities from seeking available employment. [Citations.] In these circumstances, affirmative race-conscious relief may be the only means available `to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens.' [Citations.]" (Id. at pp. 449-50, 106 S.Ct. 3019.) As Justice O'Connor observed, however, "[t]he plurality offers little guidance as to what separates an impermissible quota from a permissible goal." (Id. at p. 494, 106 S.Ct. 3019 (cone. & dis. opn. of O'Connor, J.).)
A year later, in Johnson, supra, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615, the Supreme Court validated a public agency's plan, whereby it promoted a woman over a male who ranked higher on the promotional test. Notwithstanding the lack of any evidence the agency had actually discriminated against women, the court found the plan justified by a "`conspicuous ... imbalance in traditionally segregated job categories.' [Citation.]" (Id. at p. 630, 107 S.Ct. 1442.) Departing from the burden-shifting procedures of McDonnell Douglas, supra, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, and Furnco, supra, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (see ante, 101 Cal.Rptr.2d at p. 662, fn. 7, 12 P.3d at p. 1076, fn. 7), the court concluded "[a] manifest imbalance need not be such that it would support a prima facie case against the employer ... since we do not regard as identical the constraints of Title VII and the Federal Constitution on voluntarily adopted affirmative action *666 plans." (Johnson, supra, 480 U.S. at p. 632, 107 S.Ct. 1442, fn. omitted; see also id. at p. 633, fn. 10, 107 S.Ct. 1442.) Accordingly, the agency "appropriately took into account ... sex" in making its promotional decision. (Id. at p. 641, 107 S.Ct. 1442.)
The court in Johnson approved preferential treatment of a woman because "the decision to hire [her] was made pursuant to an Agency plan that directed that sex or race be taken into account for the purpose of remedying underrepresentation." (Johnson, supra, 480 U.S. at p. 634, 107 S.Ct. 1442.) In relying on this justification, it replaced individual right of equal opportunity with proportional group representation. Although pursued for the purpose of eliminating invidious discrimination, history reveals that this prevailing social and political norm had its parallel in laws antedating the Civil Rights Act, when government could legally classify according to race. (See Van Alstyne, supra, 46 U.Chi.L .Rev. at pp. 797-803.)

D
Our own decisional law has mirrored this change in focus from protection of equal opportunity for all individuals to entitlement based on group representation. During the period the United States Supreme Court was issuing its great decisions, California was not without its own "judicial harbingers of a prejudice-free society" (DeRonde, supra, 28 Cal.3d 875, 893, 172 Cal.Rptr. 677, 625 P.2d 220 (dis. opn. of Mosk, J.)), opinions in which "this court had consistently maintained that race or similar characteristics are not a qualification or disqualification for the benefits of society." (Id. at p. 892, 172 Cal.Rptr. 677, 625 P.2d 220.) In Perez v. Sharp (1948) 32 Cal.2d 711, 198 P.2d 17, we struck down the state's antimiscegenation statute as inimical to civilized society. In James v. Marinship Corp. (1944) 25 Cal.2d 721, 155 P.2d 329, the court affirmed an order that a union admit African Americans so they could continue to work for an employer with which the union had a closed shop agreement. "Where, as here, a labor union has attained a monopoly of the labor supply through closed shop agreements, such a union, like a public service business, may not unreasonably discriminate against Negro workers for the sole reason that they are colored persons." (Id. at p. 740,155 P.2d 329.)
Hughes v. Superior Court (1948) 32 Cal.2d 850, 198 P.2d 885 (the decision reviewed in Hughes v. Superior Court of California, supra, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985) upheld a judgment of contempt against picketers who had the "unlawful objective" "not to induce [an employer] not to discriminate against, but, rather, expressly to compel [it] to discriminate arbitrarily in favor of, one race as against all others in the hiring of a portion of its clerks...." (Hughes v. Superior Court, supra, 32 Cal.2d at p. 854, 198 P.2d 885.) In words that presaged the Civil Rights Act debates, the court condemned the picketers' objective, which "would, to the extent of the fixed proportion, make the right to work for [the employer] dependent not on fitness for the work nor on an equal right of all, regardless of race, to compete in an open market, but, rather, on membership in a particular race. If petitioners were upheld in their demand then other races, white, yellow, brown and red, would have equal rights to demand discriminatory hiring on a racial basis." (Hughes, at p. 856, 198 P.2d 885.)
In Mulkey v. Reitman (1966) 64 Cal.2d 529, 50 Cal.Rptr. 881, 413 P.2d 825 (the decision reviewed in Reitman v. Mulkey, supra, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830), the court invalidated a constitutional initiative that guaranteed owners the right to discriminate in the rental or sale of their property. "`For a State to place its authority behind discriminatory treatment based solely on color is indubitably a denial by a State of equal protection of the laws, in violation of the Fourteenth Amendment.'" (Mulkey v. Reitman, supra, 64 Cal.2d at p. 541, 50 Cal.Rptr. 881, *667 413 P.2d 825.) "Here the state has affirmatively acted to change its existing laws from a situation wherein the discrimination practiced was legally restricted to one wherein it is [impermissibly] encouraged...." (Id. at p. 542, 50 Cal.Rptr. 881, 413 P.2d 825.)
Finally, in Bakke v. Regents of University of California (1976) 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (Bakke I), the plaintiff challenged a medical school admissions program that reserved 16 percent of the admission opportunities in each year's class for minority students. The court did not hesitate to find a denial of equal protection. We acknowledged, "The persuasiveness of these arguments [that preferential treatment of minorities is necessary to eliminate the lingering effects of past discrimination] cannot be denied, for the ends sought by such programs are clearly just if the benefit to minorities is viewed in isolation. But there are more forceful policy reasons against preferential admissions based on race. The divisive effect of such preferences needs no explication and raises serious doubts whether the advantages obtained by the few preferred are worth the inevitable cost to racial harmony.... Perhaps most important, the principle that the Constitution sanctions racial discrimination against a raceany raceis a dangerous concept fraught with potential for misuse in situations which involve far less laudable objectives than are manifest in the present case." (Id. at pp. 61-62, 132 Cal.Rptr. 680, 553 P.2d 1152, fn. omitted.)[10]
Following Weber, however, this court in Price v. Civil Service Com. (1980) 26 Cal.3d 257, 161 Cal.Rptr. 475, 604 P.2d 1365 (Price), declined to reaffirm its categorical hostility toward racial classifications and approved a race-conscious hiring program that required the appointment of minority applicants on a preferential basis until the appointing agency attained a certain percentage of minority employees. (See id. at p. 266, 161 Cal.Rptr. 475, 604 P.2d 1365.) Because the program was remedial and intended "to overcome the continuing effects of past discrimination" (id. at p. 270, 161 Cal.Rptr. 475, 604 P.2d 1365) as well as "bring[ ] about the full participation of minority individuals in our society" (id. at p. 286, 161 Cal.Rptr. 475, 604 P.2d 1365), a majority found it did not violate Title VII or California's Fair Employment Practices Act (FEPA). (Price, at pp. 270-277, 161 Cal.Rptr. 475, 604 P.2d 1365.) "[T]he Weber court held that title VIFs prohibition against racial discrimination does not mandate a `color-blind' approach to all employment remedies and does not compel an employer to eschew race-conscious affirmative action programs under all circumstances." (Id. at p. 273, 161 Cal.Rptr. 475, 604 P.2d 1365, fn. omitted.) Since FEPA "arose out of the same historical context as the federal Civil Rights Act," "those provisions should similarly ... be interpreted...."[11] (Price, at *668 p. 276, 161 Cal.Rptr. 475, 604 P.2d 1365; see also Minnick v. Department of Corrections, supra, 95 Cal.App.3d at pp. 523-524, 157 Cal.Rptr. 260.)
Dissenting, Justice Mosk characterized the majority's reasoning as "`double-think'": "[They] ... purport to eliminate discrimination by means of, creating discrimination; they construe equality of all persons regardless of race to mean preference for persons of some races over others; and a hiring program which compels compliance by a reluctant [county agency] is described as voluntary." (Price, supra, 26 Cal.3d 257, 286-287, 161 Cal.Rptr. 475, 604 P.2d 1365 (dis. opn. of Mosk, J.).) "It is now clear that under-girding much of the rhetoric supporting racial quotas, and preferential treatment in general, is a view of justice that demands not that the state treat its citizens without reference to their race, but that it rearrange and index them precisely on the basis of their race. The objective is not equal treatment but equal representation." (Id. at pp. 290-291, 161 Cal.Rptr. 475, 604 P.2d 1365.)
One year later in DeRonde, supra, 28 Cal.3d 875, 172 Cal.Rptr. 677, 625 P.2d 220, the court rejected an equal protection challenge to racial preferences accorded in a law school admissions program. "Having held in Price, wherein an express quota was applied, that the state Constitution places no greater restrictions on affirmative action programs encouraging increased minority representation than are imposed by the federal Constitution, a fortiori, under principles of stare decisis, we impose no state constitutional bar where the program involves no fixed quota but only consideration of race as one among several other qualifying factors." .(Id. at p. 890, 172 Cal.Rptr. 677, 625 P.2d 220.) As in Price, Justice Mosk challenged the majority's premise: "The majority, armed in adamant, insist upon turning the calendar back several decades. They have chosen to revive the indefensible practices of pre-Brown days [citation] when skin pigmentation and ethnicity were the qualifications that determined a child's school. They have rejected the plea of Justice Harlan ... for a colorblind America...." (DeRonde, supra, 28 Cal.3d 875, 891-892, 172 Cal.Rptr. 677, 625 P.2d 220 (dis. opn. of Mosk, J.).)
As with decisions of the United States Supreme Court, we thus find a fundamental shift from a staunch antidiscrimination jurisprudence to approval, sometimes endorsement, of remedial race- and sex-conscious governmental decisionmaking. (See also Price, supra, 26 Cal.3d 257, 287-289, 161 Cal.Rptr. 475, 604 P.2d 1365 (dis. opn. of Mosk, J.); Estes v. Metropolitan Branches of Dallas NAACP (1980) 444 U.S. 437, 450, 100 S.Ct. 716, 62 L.Ed.2d 626 (Powell, J., dis. from dism. of cert.); Bickel, supra, at p. 133; Van Alstyne, supra, 46 U.Chi.L.Rev. at p. 809; Bunzel, Affirmative Action, Negative Results (Nov.1979) Encounter, 43, 51.)

II
From Johnson and DeRonde, we move forward a decade to the November 5, 1996 General Election and voter approval of Proposition 209, which added section 31 to article I of the California Constitution. Section 31, subdivision (a), provides: "The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."[12] The *669 question is: Does the City's Program contravene this injunction?

A
"A constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words. [Citation.]" (Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 245, 149 Cal. Rptr. 239, 583 P.2d 1281 (Amador Valley ); People ex rel. Lungren v. Superior Court (1996) 14 Cal.4th 294, 302, 58 Cal.Rptr.2d 855, 926 P.2d 1042.) Nothing in the ballot arguments or in the Legislative Analyst's analysis suggests that a different rule should apply with respect to "discriminate" and "preferential treatment" as used in section 31, or that the voters intended them to have any specialized meaning. (See also Kidd v. State of California (1998) 62 Cal.App.4th 386, 407, 72 Cal.Rptr.2d 758; Lungren v. Superior Court (1996) 48 Cal.App.4th 435, 441, 55 Cal.Rptr.2d 690 (Lungren).) "[D]iscriminate" means "to make distinctions in treatment; show partiality (in favor of) or prejudice (against)" (Webster's New World Diet. (3d college ed.1988) p. 392); "preferential" means giving "preference," which is "a giving of priority or advantage to one person ... over others." (Id. at p. 1062.)[13] Interpreting section 31 accordingly, we conclude, as did the Court of Appeal, that the City's Program is unconstitutional because the outreach option affords preferential treatment to MBE/WBE subcontractors on the basis of race[14] or sex, and the participation option discriminates on the same bases against non-MBE/WBE subcontractors as well as general contractors that fail to fulfill either of the options when submitting their bids.
While the language of Proposition 209 is clear, and literally interpreted does not lead to absurd results (see Amador Valley, supra, 22 Cal.3d at p. 245, 149 Cal.Rptr. 239, 583 P.2d 1281), we may "test our construction against those extrinsic aids that bear on the enactors' intent" (Powers v. City of Richmond (1995) 10 Cal.4th 85, 93, 40 Cal.Rptr.2d 839, 893 P.2d 1160), in particular the ballot materials accompanying Proposition 209 that place the initiative in historical context. (See Hodges v. Superior Court (1999) 21 Cal.4th 109, 114, 86 Cal.Rptr.2d 884, 980 P.2d 433; Mulkey v. Reitman, supra, 64 Cal.2d at pp. 533-534, *670 50 Cal.Rptr. 881, 413 P.2d 825; see also Amador Valley, at pp. 245-246, 149 Cal. Rptr. 239, 583 P.2d 1281.)
The argument in favor of Proposition 209 stated in part, "A generation ago, we did it right. We passed civil rights laws to prohibit discrimination. But special interests hijacked the civil rights movement. Instead of equality, governments imposed quotas, preferences, and set-asides. [¶] Proposition 209 is called the California Civil Rights Initiative because it restates the historic Civil Rights Act.... [¶] ... [¶] ... Real `affirmative action' originally meant no discrimination and sought to provide opportunity." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) argument in favor of Prop. 209, p. 32 (Ballot Pamphlet).) "Anyone opposed to Proposition 209 is opposed to the 1964 Civil Rights Act." (Id., rebuttal to argument against Prop. 209, p. 33.)
The initiative's proponents further argued: "`REVERSE DISCRIMINATION' BASED ON RACE OR GENDER IS PLAIN WRONG! [¶] And two wrongs don't make a right! ... [¶] ... Government should not discriminate. It must not give a job, a university admission, or a contract based on race or sex. Government must judge all people equally, without discrimination! [¶] ... [¶] Government cannot work against discrimination if government itself discriminates.... It's time to bring us together under a single standard of equal treatment under the law. [¶] ... [¶] We are individuals! Not every white person is advantaged. And not every `minority' is disadvantaged. Real `affirmative action' originally meant no discrimination and sought to provide opportunity.... [¶] The only honest and effective way to address inequality of opportunity is by making sure that all California children are provided with the tools to compete in our society. And then let them succeed on a fair, color-blind, raceblind, gender-blind basis. [¶] Let's not perpetuate the myth that `minorities' and women cannot compete without special preference. Let's instead move forward by returning to the fundamentals of our democracy: individual achievement, equal opportunity and zero tolerance for discrimination againstor forany individual." (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32; see also id., Legis. Analyst's analysis of Prop. 209, p. 30 ["[Current] law requires [state] departments ... to reject bids from companies that have not made sufficient `good faith efforts' to meet [`affirmative action' contracting] goals."].)
As the district court in Coalition I, supra, 946 F.Supp. at page 1489, correctly perceived from these arguments, "the people of California meant to do something more than simply restate existing law when they adopted Proposition 209." In taking a measure of that "something more," the "historic Civil Rights Act" referent tells us the voters intended to reinstitute the interpretation of the Civil Rights Act and equal protection that predated Weber, supra, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480, and Bakke II, supra, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, as well as Price, supra, 26 Cal.3d 257, 161 Cal.Rptr. 475, 604 P.2d 1365, and DeRonde, supra, 28 Cal.3d 875, 172 Cal.Rptr. 677, 625 P.2d 220, viz., an interpretation reflecting the philosophy that "[h]owever it is rationalized, a preference to any group constitutes inherent inequality. Moreover, preferences, for any purpose, are anathema to the very process of democracy." (Price, supra, 26 Cal.3d 257, 299, 161 Cal. Rptr. 475, 604 P.2d 1365 (dis. opn. of Mosk, J.).)
By virtue of the initiative process, the California electorate "set a different course" from that charted by the courts since Weber and Price. (Weber, supra, 443 U.S. 193, 216, 99 S.Ct. 2721, 61 L.Ed.2d 480 (cone. opn. of Blackmun, J.).) "Rather than classifying individuals by race or gender, Proposition 209 prohibits the State from classifying individuals by race or gender." (Coalition for Economic Equity (9th Cir.1997) 122 F.3d 692, 702 (Coalition II); see also Johnson, supra, 480 U.S. at p. 658, 107 S.Ct. 1442 (dis. opn. *671 of Scalia, J.).) The ballot arguments from which we draw our historical perspectivemake clear that in approving Proposition 209, the voters intended section 31, like the Civil Rights Act as originally construed, "to achieve equality of [public employment, education, and contracting] opportunities" (Griggs, supra, 401 U.S. at p. 429, 91 S.Ct. 849) and to remove "barriers [that] operate invidiously to discriminate on the basis of racial or other impermissible classification." (Id. at p. 431, 91 S.Ct. 849.) In short, the electorate desired to restore the force of constitutional law to the principle articulated by President Carter on Law Day 1979: "`Basing present discrimination on past discrimination is obviously not right.'" ((May 15, 1979) 47 U.S.L. Week 2726.)

B
Considering the entirety of our discussion, we remain persuaded the City's Program violates section 31. Because the City rejects any bid that fails to comply with one or the other requirement, both of which are race and sex based, the essential structure of the Program discriminates on an impermissible basis against prime contractors that neither engage in outreach nor meet the evidentiary presumption, and it grants preferential treatment to those that do. (See Monterey Mechanical Co. v. Wilson (9th Cir.1997) 125 F.3d 702, 707, 710 (Monterey Mechanical); see also Coalition I, supra, 946 F.Supp. at pp. 1495-1496.)
The outreach component requires contractors to treat MBE/WBE subcontractors more advantageously by providing them notice of bidding opportunities, soliciting their participation, and negotiating for their services, none of which they must do for non-MBE's/WBE's. The fact prime contractors are not precluded from contacting non-MBE's/WBE's is irrelevant. The relevant constitutional consideration is that they are compelled to contact MBE's/WBE's, which are thus accorded preferential treatment within the meaning of section 31. (See Monterey Mechanical, supra, 125 F.3d at p. 711; see also Furnco, supra, 438 U.S. at p. 577, 98 S.Ct. 2943 ["The central focus of the inquiry ... is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin' [citation]."]; cf. Mulkey v. Reitman, supra, 64 Cal.2d at pp. 540, 542, 50 Cal.Rptr. 881, 413 P.2d 825; Anderson v. Martin, supra, 375 U.S. at p. 403, 84 S.Ct. 454; Peterson v. Greenville, supra, 373 U.S. at p. 248, 83 S.Ct. 1119.)
The participation component authorizes or encourages what amounts to discriminatory quotas or set-asides, or at least race- and sex-conscious numerical goals. (See Monterey Mechanical, supra, 125 F.3d at p. 711; Bras v. California Public Utilities Commission (9th Cir.1995) 59 F.3d 869, 875 (Bras); see generally Mulkey v. Reitman, supra, 64 Cal.2d at p. 541, 50 Cal. Rptr. 881, 413 P.2d 825; Anderson v. Martin, supra, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430.) A participation goal differs from a quota or set-aside only in degree; by whatever label, it remains "a line drawn on the basis of race and ethnic status" as well as sex. (Bakke II, supra, 438 U.S. at p. 289, 98 S.Ct. 2733, fn. omitted; see Bras, supra, 59 F.3d at pp. 874-875.) Thus understood, such a goal plainly runs counter to the express intent of the historic Civil Rights Act and, concomitantly, the intent of Proposition 209. As members of Congress were repeatedly assured regarding Title VII, the Act "`provides no preferential treatment for any group of citizens. In fact, it specifically prohibits such treatment' [Citation.]" (Weber, supra, 443 U.S. at p. 248, 99 S.Ct. 2721, some italics added (dis. opn. of Rehnquist, J.), quoting remarks of Sen. Saltonstall, Chair of the Republican Conf. of Sens. (110 Cong. Rec. 12691 (1964).) While perhaps less explicit in the Act itself, the same may be said for the race- and sex-conscious outreach at issue here, in that it effectively provides an advantage to members of the targeted groups. For example, in Furnco, *672 supra, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957, the Supreme Court rejected a requirement that an employer alter its race-neutral hiring practices and institute a method that allowed it "to consider the qualifications of the largest number of minority applicants." (Id. at p. 576, 98 S.Ct. 2943.) "We think the imposition of that ... simply finds no support either in the nature of the prima facie case or the purpose of Title VII." (Id. at pp. 576-577, 98 S.Ct. 2943; see id. at p. 578, 98 S.Ct. 2943.)
The City's Program essentially places on a contractor the burden of disproving a negative. Without any prima facie proof of past misconduct, a contractor must establish its responsibility as a bidder by showing it does not discriminate on an impermissible basis in its subcontracting. As with any requirement that utilizes preferences, this completely inverts the normal procedures for making discrimination claims. (See, e.g., Furnco, supra, 438 U.S. at pp. 577-578, 98 S.Ct. 2943 [describing the burden-shifting procedure for complainants under Title VII]; cf. Croson, supra, 488 U.S. 469, 516, 109 S.Ct. 706,102 L.Ed.2d 854 (cone. opn. of Stevens, J.) ["[I]t is only habit, rather than evidence or analysis, that makes it seem acceptable to assume that every white contractor covered by the ordinance shares in that guilt [of past discrimination]"]; Sheet Metal Workers, supra, 478 U.S. at p. 494, 106 S.Ct. 3019 (cone. & dis. opn. of O'Connor, J.) ["it is completely unrealistic to assume that individuals of each race will gravitate with mathematical exactitude to each employer or union absent unlawful discrimination"].) Furthermore, a contractor may show nondiscrimination only in the manner designated by the City, either according to a fixed participation goal or by prescribed outreach to MBE's and WBE's. In other words, it can only prove it does not discriminate against minorities and women by discriminating or granting preferences in their favor. (See Johnson, supra, 480 U.S. 616, 675-676, 107 S.Ct. 1442, 94 L.Ed.2d 615 (dis. opn. of Scalia, J.); Bras, supra, 59 F.3d at p. 874.)
Contrary as well to the principles of the Civil Rights Act, listing a sufficient number of MBE/WBE subcontractors to meet the evidentiary presumption may potentially give cover to discrimination committed after a contractor has met the established goal. In Furnco, supra, 438 U.S. at page 579, 98 S.Ct. 2943, the Supreme Court made clear, "A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination." "[T]he obligation imposed by Title VII is to provide an equal opportunity for each applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force. [Citations.]" (Ibid.)
To summarize, the City's own description of its Programrequiring that a responsive bid contain either a sufficient number of MBE/WBE subcontractors or documentation of outreachdemonstrates its invalidity under section 31. (See Coalition I, supra, 946 F.Supp. at pp. 1495-1496.) Satisfying the participation option discriminates against non-MBE's/WBE's on the basis of race and sex in the operation of public contracting to the extent the prime contractor utilizes sufficient MBE/WBE subcontractors to meet the City's evidentiary presumption. Satisfying the outreach option grants preferential treatment because prime contractors must notify, solicit bids from, and negotiate with MBE's and WBE's, but may exclude non-MBE's/WBE's. If a contractor fails to satisfy either option, the City discriminates on the basis of race and sex by rejecting its bid out of hand even, as in this case, when that bid is the lowest otherwise responsive submission.
This result is precisely what the voters were told Proposition 209 would prohibit. "Programs designed to ensure that all personsregardless of race or genderare informed of opportunities and treated with equal dignity and respect will continue as *673 before." (Ballot Pamp., supra, rebuttal to argument against Prop. 209, p. 33.) By implication, programs such as the City's that disseminate information on a selective basis would not continue. The Legislative Analyst also explained that "the measure would eliminate programs that give preference to women-owned or minority-owned companies on public contracts.... [¶] ... [B]idders on contracts no longer would need to show `good faith efforts' to use minority-owned or women-owned subcontractors. Thus, state and local governments would save money to the extent they otherwise would have rejected a low bidderbecause the bidder did not make a 'good faith effort'and awarded the contract to a higher bidder." (Id., Legis. Analyst's analysis of Prop. 209, p. 31.)
Although we find the City's outreach option unconstitutional under section 31, we acknowledge that outreach may assume many forms, not all of which would be unlawful. (Cf. Lungren, supra, 48 Cal. App.4th 435, 55 Cal.Rptr.2d 690.) Our holding is necessarily limited to the form at issue here, which requires prime contractors to notify, solicit, and negotiate with MBE/WBE subcontractors as well as justify rejection of their bids. Plainly, the voters intended to preserve outreach efforts to disseminate information about public employment, education, and contracting not predicated on an impermissible classification. (See Ballot Pamp., supra, rebuttal to argument against Prop. 209, p. 33; see also Lungren, supra, 48 Cal.App.4th at p. 442, 55 Cal.Rptr.2d 690; cf. Domar Electric, Inc. v. City of Los Angeles (1994) 9 Cal.4th 161, 174, 36 Cal. Rptr.2d 521, 885 P.2d 934 [pre-Proposition 209 decision upholding city requirement "mandating reasonable good faith outreach to all types of subcontractor enterprises," not just MBE's and WBE's, that sought "to increase opportunity and participation within the competitive bidding process"].) We express no opinion regarding the permissible parameters of such efforts.

III
The City and its amici curiae advance several arguments in support of the Program's constitutionality, none of which is persuasive.
The City first contends Lungren, supra, 48 Cal.App.4th 435, 55 Cal.Rptr.2d 690, established that "targeted" or "focused" outreach does not come within the scope of section 31. In Lungren, various parties brought a preelection challenge to the title and summary of Proposition 209 prepared by the Attorney General, asserting it was misleading because it failed to inform the voters the initiative would ban all "`affirmative action.'" (Lungren, at p. 441, 55 Cal.Rptr.2d 690.) The Court of Appeal rejected the challenge because the title contained "essentially verbatim recitations of the operative terms of the measure. The Attorney General has added nothing, omitted nothing and the words used are all subject to common understanding." (Ibid.) The court then went on to note that "`"affirmative action"'" had no commonly agreed-upon definition and that "[m]ost definitions of the term would include not only the conduct which Proposition 209 would ban, i.e., discrimination and preferential treatment, but also other efforts such as outreach programs." (Id. at p. 442, 55 Cal.Rptr.2d 690.)
From this single observation, which appears unnecessary to the holding (see Lungren, supra, 48 Cal.App.4th 435, 443, 55 Cal.Rptr.2d 690 (cone. opn. of Sims, J.)), the City extrapolates that the voters must have understood and intended that the outreach component of its program would not run afoul of Proposition 209. The simple answer is that the Court of Appeal in Lungren was not considering the constitutionality of the City's Program or the meaning of "discriminate" or "preferential treatment" as those terms apply to the Program. The court also did not refer to "targeted" or "focused" outreach or to programs formulated to take into account race and sex. Moreover, both the Legislative Analyst's analysis and the arguments *674 against Proposition 209 indicated outreach would likely be eliminated by the initiative to the extent it operated on the basis of race or sex. (Ballot Pamp., supra, Legis. Analyst's analysis of Prop. 209, p. 31; id., argument against Prop. 209, p. 33.)
The City also relies on the fact the ballot argument in favor of Proposition 209 did not indicate the initiative would prohibit "targeted" outreach. We do not read the ballot arguments as an exhaustive catalogue of the specific programs and measures that would fall under section 31. Rather, they spoke generically, emphasizing that any action that discriminates or grants preferential treatment on the basis of race or sex would be forbidden. By the same token, they assured voters Proposition 209 "allows any program that does not discriminate, or prefer, because of race or sex, to continue." (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32.) "Affirmative action programs that don't discriminate or grant preferential treatment will be UNCHANGED ." (Id., rebuttal to argument against Prop. 209, p. 33.) Impliedly, those programs that do discriminate would be illegal. Moreover, the opponents warned that the initiative "`puts at risk every outreach program....'" (Id., argument against Prop. 209, p. 33, quoting Gen. Colin Powell.) These indicia of voter intent leave no room for the City's outreach requirement, which is overtly predicated on race and sex preferences.
The City and some amici curiae contend "focused" outreach is not a "preference" as that term is presently construed under Title VII and the equal protection clause. Considering the historical context of Proposition 209, this contention reflects a fundamental misperception of the electorate's intent to "restate[ ] the historic Civil Rights Act...." (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32.) As we have explained, those who supported and enacted "the historic Civil Rights Act" sought to ensure equal opportunity for all and eliminate race and sex from decisionmaking in employment and other areas. By 1996, however, judicial construction of both the Act and the equal protection clause had engrafted a series of qualifications permitting race- and sex-conscious programs formulated to remediate the lingering effects of past discrimination or conspicuous imbalance in the work force. If the electorate had determined merely to reiterate this status quo, an initiative amending the state Constitution would be unnecessary. Rather, we have concluded the "something more" the voters intended (Coalition I, supra, 946 F.Supp. at p. 1489) was essentially a repudiation of the decisional authority that permitted such discrimination and preferential treatment, notwithstanding antecedent statutory and constitutional law to the contrary. (See also Coalition II, supra, 122 F.3d at p. 709, fn. 18.)
The City's assertion that its outreach requirement merely "expands the applicant pool" is both misleading and irrelevant. To the extent it automatically eliminates bids that fail to document outreach or meet the evidentiary hiring presumption, it reduces the number of otherwise qualified bids it considers responsive. Even if it did accomplish its purported goal, a benign motivation cannot sanction a requirement that conflicts with the proscription against discrimination and preferential treatment on the basis of race and sex. Moreover, the Civil Rights Act was intended only to remove the barriers to equal opportunity (Griggs, supra, 401 U.S. at pp. 430-131, 91 S.Ct. 849), not maximize the number of applicants actually considered. (Furnco, supra, 438 U.S. at pp. 577-578, 98 S.Ct. 2943.) Cases cited by the City as examples of impermissible programs more overtly preferential are equally beside the point. At best, they illustrate what would suffice, not what is necessary, to violate section 31.
In a related vein, the City and its amici curiae argue that equal protection does not preclude race-conscious programs. While true, this point has no bearing on our construction of section 31. *675 Equal protection allows discrimination and preferential treatment whenever a court determines they are justified by a compelling state interest and are narrowly tailored to address an identified remedial need. (See, e.g., United States v. Paradise, supra, 480 U.S. at pp. 185-186, 107 S.Ct. 1053 [approving racial quotas].) It does not, however, preclude a state from providing its citizens greater protection against both. (Cf. Shaw v. Reno (1993) 509 U.S. 630, 654, 113 S.Ct. 2816, 125 L.Ed.2d 511 [with respect to equal protection, "courts must bear in mind the difference between what the law permits and what it requires"].) Unlike the equal protection clause, section 31 categorically prohibits discrimination and preferential treatment. Its literal language admits no "compelling state interest" exception; we find nothing to suggest the voters intended to include one sub silentio.
The fact that as currently interpreted Title VII and title VI allow outreach of the type the City requires misses the mark for the same reason. Rather than incorporate the judicial gloss of Weber and its progeny, the voters intended to remove it. "Let's ... return[] to the fundamentals of our democracy: individual achievement, equal opportunity and zero tolerance for discrimination againstor forany individual." (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32.) As originally implemented, "Title VII tolerate[d] no racial discrimination, subtle or otherwise." (McDonnell Douglas, supra, 411 U.S. at p. 801, 93 S.Ct. 1817.) It was applied to "remove barriers that have operated ... to favor an identifiable group ... over other employees." (Griggs, supra, 401 U.S. at pp. 429-130, 91 S.Ct. 849.) With the approval of Proposition 209, the electorate chose to reassert the principle of equality of individual opportunity as a constitutional imperative.
Finally, the City and several amici curiae, including the United States, contend the Program is necessary to discharge the City's duty under federal law to eradicate the discrimination against subcontractors documented by its disparity study. (See, e.g., Wygant, supra, 476 U.S. 267, 291, 106 S.Ct. 1842, 90 L.Ed.2d 260 (cone. opn. of O'Connor, J.); see also Croson, supra, 488 U.S. at p. 509, 109 S.Ct. 706.) At oral argument, however, the San Jose City Attorney conceded the Program is "not constitutionally required" and "not federally mandated." Even without this concession, we are unpersuaded of the argument for several reasons.
First, the United States Supreme Court "never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classification in order to remedy such discrimination." (Wygant, supra, 476 U.S. at p. 274, 106 S.Ct. 1842.) Thus, the only constitutional obligation is the "`affirmative duty to desegregate'" (id. at p. 276, 106 S.Ct. 1842, quoting Swann v. Charlotte-Mecklenburg Bd. of Education (1971) 402 U.S. 1, 31-32, 91 S.Ct. 1267, 28 L.Ed.2d 554), also referred to as the duty to "disestablish" the results of intentional discrimination. (North Carolina State Bd. of Education v. Swann (1971) 402 U.S. 43, 46, 91 S.Ct. 1284, 28 L.Ed.2d 586; see also Associated General Contractors of California, Inc. v. City and County of San Francisco (9th Cir.1987) 813 F.2d 922, 929; Associated General Contractors of California v. San Francisco Unified Sch. Dist. (9th Cir.1980) 616 F.2d 1381, 1386.) Where the state or a political subdivision has intentionally discriminated, use of a race-conscious or race-specific remedy necessarily follows as the only, or at least the most likely, means of rectifying the resulting injury. (North Carolina State Bd. of Education v. Swann, supra, 402 U.S. at p. 46, 91 S.Ct. 1284; see Van Alstyne, supra, 46 U. Chi. L.Rev. at pp. 783-784.) The City's disparity study, at best, creates only an inference of discrimination against MBE/WBE subcontractors by prime contractors; *676 it does not establish intentional acts by the City.
Second, this argument ignores the distinction between actions the federal Constitution allows and those it demands. As the Ninth Circuit Court of Appeals observed in finding that Proposition 209 did not violate federal equal protection, "To hold that a democratically enacted affirmative action program is constitutionally permissible because the people have demonstrated a compelling state interest is hardly to hold that the program is constitutionally required. The Fourteenth Amendment, lest we lose sight of the forest for the trees, does not require what it barely permits." (Coalition II, supra, 122 F.3d at p. 709; see Shaw v. Reno, supra, 509 U.S. at p. 654, 113 S.Ct. 2816.)
There is also no duty under federal statutory law to take corrective action in the absence of discrimination. The Supreme Court in Weber, supra, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480, and Johnson, supra, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615, only determined Title VII does not preclude an employer from utilizing race- and sex-conscious programs under certain circumstances. It did not find Title VII mandates such programs. In fact, Title VII expressly provides for the supremacy of state law "other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter." (42 U.S.C. § 2000e-7.) Moreover, the federal courts have held Proposition 209 does not conflict with Titles VI, VII, or IX of the Civil Rights Act of 1964. (Coalition II, supra, 122 F.3d at pp. 709-718 [Title VII]; Coalition I, supra, 946 F.Supp. at pp. 1517-1519 [Titles VI and IX].) "The mere fact that affirmative action is permissible under the Title VI and IX regulations, and some judicial interpretation, does not require preemption of a state law that prohibits affirmative action." (Coalition I, supra, 946 F.Supp. at p. 1518.)
Third, if it were determined the City had violated federal constitutional or statutory law, the supremacy clause as well as the express terms of Proposition 209 would dictate federal law prevails: "If any part or parts of [section 31] are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit." (§ 31, subd. (h); see also id., subds. (d) [preserving preexisting court orders and consent decrees] & (e) [preserving any action necessary to establish or maintain eligibility for federal funding].)
Finally, we question the City's implicit premise that its Program meets the federal equal protection standard. As the Supreme Court explained in Wygant, supra, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260, "the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose. [Citation.] `Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.' [Citation.]" (Id. at p. 280, 106 S.Ct. 1842, fn. omitted.) The disparity study is not part of the record in this case. Without it, the court has no basis for measuring the fit between the Program and the goal of eliminating a disparity in the amount of contract dollars awarded MBE's in comparison to non-MBE's.

DlSPOSITION
The judgment of the Court of Appeal is affirmed.
MOSK, J., BAXTER, J., and CHIN, J., concur.
Concurring Opinion by MOSK, J.
I concur in the opinion of the court.
I write separately because, on one point, I wish to say somewhat more.

*677 I
I agree with the court in the substance of its analysis, which involves its reading of section 31 of article I of the California Constitution (section 31) and its application to the City of San Jose's "Nondiscrimination/Nonpreferential Treatment Program" applicable to public contracts for construction projects in excess of $50,000.

A
By initiative measure denominated as Proposition 209 on the ballot at the November 5, 1996, General Election, and approved by the voters thereat, section 31 was added to article I of the California Constitution.
Section 31 provides that "[t]he State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." (Cal. Const, art. I, § 31, subd. (a).) It defines the "State" to "include, but not necessarily be limited to, the State itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the State." (Id., art. I, § 31, subd. (f).)
Stated negatively, section 31 prohibits governmental actors from improperly burdening or benefiting any individual or group in the operation of public employment, public education, or public contracting. The prohibition is not limited to barring such actors from improperly assigning burdens or benefits themselves. Rather, it extends to barring them from enabling, facilitating, encouraging, or requiring private parties to do so as well. For the operation of each of the indicated activities involves private parties as well as governmental actorsin other words, the operation of each entails the cooperation of both. One of section 31's purposes is to preclude any invidious barrier or privileged entrance to participation.
Stated positively, section 31 commands governmental actors to treat all individuals and groups equally in the operation of public employment, public education, and public contracting. The command is not limited to compelling governmental actors to afford equal treatment themselves. Rather, it extends to compelling governmental actors to enable, facilitate, encourage, and require private parties to do so as well. Again, the operation of each of the indicated activities involves private parties as well as governmental actors, the operation of each entailing the cooperation of both. One of section 31's purposes is to remove all invidious barriers and privileged entrances to participation.
Neither section 31's prohibition against the improper assigning of any burden or benefit in the operation of public employment, public education, or public contracting, nor its command of equal treatment therein, is limited solely to ends. Rather, both extend to means as well. Thus, one may not assign any burden or benefit improperly in an attempt to assign some other burden or benefit properly. Similarly, one may not afford treatment that in any respect is unequal in an attempt to afford treatment that in some other respect is equal. For section 31 at least, the end does not justify the means. Rather, means and end must each justify itself in light of section 31's prohibition and command.

B
On October 21, 1997, through its city council, the City of San Jose adopted its "Nondiscrimination/Nonpreferential Treatment Program" applicable to public contracts for construction projects in excess of $50,000. It did so in response to "evidence that discriminatory practices existed in construction subcontracting" for public works on the part of prime contractors and evidently the city itself with regard to *678 subcontracting firms that are owned by women or members of minority groups. It sought to remedy the effects of past discrimination and preferential treatment, and to prevent present or future discrimination or preferential treatment, in the operation of public subcontracting.
The city's program requires a prime contractor bidding on a covered public works contract, among other things, "to demonstrate nondiscrimination/nonpreferential treatment ... in the hiring of subcontractors" before he can become eligible to be awarded the contract in question.
Specifically, the city's program requires the prime contractor to make a demonstration of nondiscrimination/nonpreferential treatment by providing, as he may choose, either "documentation of outreach" or "documentation of participation."
Under the documentation-of-outreach component, which is relatively more burdensome, the prime contractor must "provide[] written notice ... of his ... interest in bidding on the contract" in question "to not less than four" subcontracting firms that are owned by women or members of minority groups "in each appropriate trade or area of work or supply ... at least 10 calendar days prior to the opening of bids"; must "follow[] up" such "written notices by contacting" each such firm "to determine with certainty whether" it is "interested in proposing to perform specific items of the project," "documenting] the name of an individual employee of each ... firm with whom" he "spoke concerning the project or the date and time of at least three ... attempts during regular business hours to contact each ... firm"; and must "negotiate[ ] in good faith with" each such firm and "not unjustifiably reject" any ensuing bid "as unsatisfactory." (Underscoring omitted.)
By contrast, under the documentation-of-participation component, which is relatively less burdensome, the prime contractor must "document[ ] the participation of subcontracting firms that are owned by women or members of minority groups meeting the "percentage of such firms that the city has "established], as an evidentiary presumption," as the "percentage ... that would be expected to be included ... in the absence of discrimination" or preferential treatment.
After review, it becomes evident that, in both its documentation-of-outreach and its documentation-of-participation components, the city's program violates section 31.
To be sure, the end that the city's program seeks is altogether legitimate and even necessary under section 31.
The purpose of the city's program accords with, and is indeed compelled by, the purpose of section 31. As stated, the program's object is to remedy the effects of past discrimination and preferential treatment, and to prevent present or future discrimination or preferential treatment, in the operation of public subcontracting. As also stated, section 31's object is to remove and preclude any and all invidious barriers and privileged entrances to participation in the operation of activities including public contracting.
Nevertheless, despite the legitimacy and even necessity of its end, the means that the city's program employs offend section 31.
The documentation-of-outreach component of the city's program, with which a prime contractor who so chooses must comply in order to establish eligibility, requires the prime contractor to grant preferential treatment to subcontracting firms that are owned by women or members of minority groups. As explained, it requires him to provide written notice of his interest in bidding on the contract in question to no fewer than four subcontracting firms that are owned by women or members of minority groups in each pertinent trade or area of work or supply at least 10 calendar days prior to the opening of bids, to follow up such written notice with documentation of his efforts, and to *679 negotiate in good faith and not unjustifiably reject as unsatisfactory any bid that may be forthcoming. It does not require him to take any of these steps otherwise. It thereby skews the process in favor of subcontracting firms that are owned by women or members of minority groups. Not only does it invite those firms into the process, it also guarantees that they will be dealt with well during its course, and will not be ushered out without reason at its end. It does not do the same for others.
The documentation-of-participation component of the city's program, with which a prime contractor who so chooses must comply in order to establish eligibility, at least encourages the prime contractor to grant preferential treatment to subcontracting firms that are owned by women or members of minority groups. As explained, it requires him to meet the "evidentiary presumption" that the city has established as the percentage of such firms that would be expected to be included in the absence of discrimination or preferential treatment. It at least encourages him to select such firms in such percentage when all other things are equaland even when they are notin order to avoid the need to comply with the more burdensome documentation-of-outreach component. It thereby skews the outcome in favor of subcontracting firms that are owned by women or members of minority groups. Inclusion of those firms can help the prime contractor obtain award of the contract in question. Inclusion of others cannot.
In sum, the means that the city's program employs through its documentation-of-outreach and documentation-of-participation components offend section 31 because they either require or at least encourage a prime contractor to grant preferential treatment to subcontracting firms that are owned by women or members of minority groups.

II
Although I agree with the court in the substance of its analysis, on a single point I would go farther than it does.
In a strict sense, it is sufficient to read section 31 soundly and apply it to the city's program correctly.
But, as a practical matter, to do so is hardly enough. It gives scant guidance to the city itself or to other governmental actors. Some such guidance seems appropriate and even needed. Passivity is not demanded by section 31. Nor can it even be tolerated. Not only does section 31 prohibit governmental actors from improperly burdening or benefiting any individual or group in the operation of activities including public contracting, in order to preclude any invidious barrier or privileged entrance to participation. But it also commands such actors to treat all individuals and groups equally, in order to remove all such barriers and entrances.
By way of guidance, we may perhaps use the city's program as a template for a measure that would satisfy section 31 in both its end and its means by retaining only its documentation-of-outreach component, and by modifying that component as follows.
A prime contractor would have to provide written notice of his interest in bidding on the contract in question to no fewer than, say, 10 subcontracting firms of his own choosing in each pertinent trade or area of work or supply at least 10 calendar days prior to the opening of bids, noting the identity of the owner or owners of each such firmall to be reflected on a form to be filed as a public record. He would have to follow up such written notice with documentation of his effortsagain, all to be reflected on a form to be filed as a public record. And he would have to negotiate in good faith and not unjustifiably accept as satisfactory, or reject as unsatisfactory, any bid that may be forthcoming, stating his reasons for accepting or rejecting eachyet again, all to be reflected on a form to be filed as a public record.
Such a documentation-of-outreach component would be consistent with section *680 31's prohibition that governmental actors must not themselves improperly burden or benefit any individual or group in the operation of activities including public contracting, or enable, facilitate, encourage, or require private parties to do so. It would also be consistent with section 31's command that such actors must themselves treat all individuals and groups equally, and enable, facilitate, encourage, and require such parties to do so.
A documentation-of-outreach component like the above might prove to be an effective mechanism for prophylaxis. It would cause the prime contractor, one would hope, to rationalize his subcontracting conduct and thereby afford the commanded equal treatment and avoid the prohibited improper benefiting or burdening.
Furthermore, a documentation-of-outreach component like the above might prove to be an effective mechanism for monitoring. It would cause the prime contractor to make a public record of his subcontracting conduct and thereby provide evidence of compliance or noncompliance, as the case may be.
It is true that such a documentation-of-outreach component would require the prime contractor to note the identity of the owner or owners of each subcontracting firm to which he chooses to provide written notice. But it would hardly require him to improperly benefit any such firm or burden any other or to afford treatment that is at all unequalor even encourage, facilitate, or enable him to do so. For it would work solely as a prophylactic and monitoring device, furthering the component's prophylactic and monitoring function.

III
In conclusion, concurring as I do in the opinion of the court, I concur in its judgment affirming the judgment of the Court of Appeal.
Concurring Opinion by KENNARD, J.
I concur in the judgment without joining Justice Brown's majority opinion, Justice Mosk's concurring opinion, or the Chief Justice's concurring and dissenting opinion.
At issue is whether a public contracting program of the City of San Jose violates article I, section 31 of the California Constitution, enacted by initiative in 1996, which declares that "[t]he State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." I agree with the majority that the ordinary plain meaning of "preferential" is "`priority or advantage to one person ... over others.'" (Maj. opn., ante, 101 Cal.Rptr.2d at p. 669, 12 P.3d at p. 1082.) Both the majority and the Chief Justice review the ballot materials that explained the constitutional initiative measure to the voters (maj. opn., ante, at pp. 669-671, 12 P.3d at pp. 1082-1084; cone. & dis. opn., post, at pp. 685-689, 12 P.3d at pp. 1096-1100), and I agree with the majority that nothing in those materials suggests that those who enacted this constitutional provision intended the word "preferential" to have other than its common and accepted meaning. Applying this common meaning of "preferential," I agree with the majority, the Chief Justice, and Justice Mosk that the challenged program of the City of San Jose grants preferential treatment on the basis of race and sex in the operation of public contracting. (Maj. opn., ante, at p. 671, 12 P.3d at p. 1084; cone. opn. of Mosk, J., ante, at pp. 678-679, 12 P.3d at pp. 1090-1091; cone. & dis. opn., post, at pp. 692, 695, 12 P.3d at pp. 1102, 1105.)
Because the issue presented is readily resolved by reference to the ordinary meaning of the constitutional text and a review of the ballot materials submitted to the voters who enacted the constitutional *681 provision, I see no need to discuss potentially divisive matters, such as the history of judicial construction of federal constitutional equal protection and statutory civil rights provisions as applied to racial distinctions (maj. opn., ante, at pp. 658-668, 12 P.3d at pp. 1072-1081), possible modifications of the City of San Jose's program to "satisfy section 31 in both its end and its means" (cone. opn. of Mosk, J., ante, at pp. 679-680, 12 P.3d at pp. 1091-1092), or commonly offered justifications for race-conscious affirmative action programs (cone. & dis. opn., post, at pp. 682-684, 12 P.3d at pp. 1093-1095). But I join the majority, Justice Mosk, and the Chief Justice in affirming the Court of Appeal's judgment.
Concurring and Dissenting Opinion by GEORGE, C.J.
I agree with all of my colleagues that the particular features of the affirmative action program that are challenged in this case violate article I, section 31, of the California Constitutionthe section added to the California Constitution in 1996 by the voters' passage of Proposition 209 because these features grant "preferential treatment" to individuals or groups on the basis of race or gender as proscribed by this newly added constitutional provision.[1]
I cannot join the majority opinion, however, because in my view the major portion of that opinion's discussion is not only unnecessary to the resolution of the issue before us, but is likely to be viewed as less than evenhanded. Particularly in a case involving an initiative measure that is as sensitive and potentially divisive as Proposition 209, I believe it is essential that this court speak through an opinion whose language and analysis clearly demonstrate to the parties and to the public that the court appreciates that its task is simply to interpret and apply the initiative's language so as to effectuate the electorate's intent. Viewing the majority opinion as a whole, I believe it falls short of this standard.

I
There can be no dispute that discrimination on the basis of race, gender, color, ethnicity, and national origin has played a pernicious role in the history of both our nation and our state. This historical discrimination has left our society with a woeful legacy that has proven difficult to overcome. Persons of goodwill hold widely differing, and very strongly felt, views regarding both the morality and the efficacy of utilizing race- or gender-conscious policies or programs as remedial tools to combat the lingering effects of past discrimination and to attempt to avoid the perpetuation of such discrimination in the present and into the future.
In resolving the issue presented in the case now before us, there is no reason for this court to revisit and reassess past judicial decisions, rendered prior to the passage of Proposition 209, that considered the general validity of utilizing race- or gender-conscious measures as part of an affirmative action program, or to engage in an extended inquiry into whether such measures are or are not consistent with our nation's and our state's constitutional tradition. Our role, rather, is simply to interpret and apply the language of the new state constitutional provision so as to effectuate the intent of the voters who adopted the measure. In my view, the majority opinion departs from that role in a number of respects.
First, a substantial portion of the majority opinion is devoted to a lengthy discussion of past decisions of the United States Supreme Court and this court that involve either racially discriminatory practices that unquestionably had no remedial purpose or effect, or affirmative action programs that predate the passage of Proposition *682 209. (See maj. opn., ante, 101 Cal. Rptr.2d at pp. 658-668, 12 P.3d at pp. 1072-1081.) The majority opinion's lengthy discussion of these cases culminates in a general critique of a number of past decisions of the United States Supreme Court and of this court that have concluded that (in some circumstances) neither the federal nor the state equal protection clause, nor title VII of the federal Civil Rights Act of 1964 (42 U.S .C. § 2000e et seq.) (hereafter Title VII) or its California counterpart, precludes Congress, a state, or private parties from voluntarily adopting an affirmative action program that, for remedial purposes, explicitly takes race or gender into account. (See, e.g., University of California Regents v. Bakke (1978) 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750; Steelworkers v. Weber (1979) 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480; Johnson v. Transportation Agency (1987) 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615; Price v. Civil Service Com. (1980) 26 Cal.3d 257, 161 Cal.Rptr. 475, 604 P.2d 1365.) The overall tenor of the majority opinion's discussion of these decisionsincluding its repeated and favorable quotation from dissenting opinions in these cases and from academic commentators critical of these decisions leaves little doubt that the majority opinion embraces the view that the types of affirmative action programs at issue in these past decisions always have violated the provisions of the federal and state equal protection clauses and Title VII, and that the numerous decisions of the United States Supreme Court and this court that reached a contrary conclusion were wrongly decided.
The issue before us in this case, however, is not the validity of past decisions interpreting or applying other constitutional or statutory provisionssuch as the federal or state equal protection clauses or Title VIIbut rather the proper interpretation and application of article I, section 31, the provision added to the California Constitution by Proposition 209 (hereafter article I, section 31). This newly added constitutional provision is by its terms limited specifically to governmental actions "in the operation of public employment, public education, or public contracting," and does not purport to affect constitutional or statutory doctrine outside this specified realm. In view of the limited issue before us, it is unnecessary and inappropriate to use this case as an occasion in which to attack the analysis and conclusions of pre-Proposition 209 decisions of either the United States Supreme Court or this court construing other constitutional or statutory provisions, and thereby to throw into doubt the continued applicability of those decisions outside the realm addressed by article I, section 31. The devotion of so much of the majority opinion's discussion to criticism of the currently prevailing interpretation of both Title VII and the equal protection clause, can serve only to undermine confidence in the opinion's analysis of the legal question actually presented by this case, i.e., the proper interpretation and application of article I, section 31.
Second, by using misleading and unflattering slogans to characterize past judicial decisions upholding race-conscious and gender-conscious affirmative action programsdescribing such decisions as "replacing] individual right of equal opportunity with proportional group representation " (maj. opn., ante, at p. 666, 12 P.3d p. 1079, italics added) and as endorsing a change "from protection of equal opportunity for all individuals to entitlement based on group representation" (ibid., italics added)the majority opinion, in my view, will be widely and correctly viewed as presenting an unfair and inaccurate caricature of the objective or justification of the overwhelming majority of race- or gender-conscious affirmative action programs. Nowhere does the majority opinion consider alternative rationales for affirmative action programsgrounds that cannot be as easily disparaged when not saddled by the catchphrases ("proportional group representation," *683 "entitlements based on group representation") employed by the majority opinion.
The terminology employed by the majority opinion ignores the circumstance that, in many instances, race or gender has been utilized as a "plus" factor in the affirmative actionsetting not because of any belief in group entitlement or proportional representation, but rather to obtain the benefits that are anticipated to flow from the inclusion of one or more persons from groups that are not currently represented in a given entity or organization. For example, at a time when no woman or member of a racial minority ever had served on the United States Supreme Court, if a President, in choosing among equally qualified candidates for a seat on the court, were to have taken into consideration a candidate's race or gender as a factor in the decision whom to appoint, the use of race or gender could not accurately be characterized as based on group entitlement or proportional representation, but rather likely would rest on the belief that such a characteristic of the candidate would bring something worthwhile to the court as a whole, both in terms of the public's relative confidence in the institution and because members of such previously unrepresented groups might add something distinctive and valuable to the court's deliberations and decisionmaking. Similarly, when a college or university whose student body has been and continues to be almost all White voluntarily decides to institute an affirmative action policy under which qualified minority applicants are given special consideration, the justification for the policy may not be based upon any notion of "entitlement based on group representation" or "proportional group representation," but instead may well stem from a genuine belief on the part of the institution that an integrated student body will provide a better education for all students attending the school. And a comparable justification may underlie many of the affirmative action programs voluntarily instituted in recent years by those large corporations that have concluded that an integrated work force (including management) enables the organization to better serve its diverse clientele.
Another common justification for the adoption of an affirmative action program is that it may serve as a means of taking into account or remedying the continuing effects of past discrimination. For example, with regard to a job category (such as the construction trades) from which women traditionally have been excluded, an employer might conclude that when two applicants (one a man, one a woman) perform equally well on a qualifying test, the woman's performance actually might demonstrate that she has greater potential because she has managed to attain her current skill level despite the lack of general societal or cultural support for such an endeavor. Again, the use of gender-conscious affirmative action in this manner does not necessarily reflect a belief in group entitlement or proportional representation, but rather a more benign justification.
Of course, the circumstance that the objective or justification for a race- or gender-conscious affirmative action program is not group entitlement or proportional representation but some other, more defensible, purpose does not necessarily mean that the program is constitutional, either under pre-Proposition 209 or post-Proposition 209 principles. But the majority opinion's characterization of past judicial decisions upholding race- or gender-conscious affirmative action as based in general upon a view that emphasizes group entitlement or proportional representation is not an objective description, and the opinion's resort to these highly charged slogans undermines the credibility of its ruling.
Finally, in my view, the general theme that runs throughout the majority opinion's historical discussionthat there is no meaningful distinction between discriminatory racial policies that were imposed *684 for the clear purpose of establishing and preserving racial segregation, on the one hand, and race-conscious affirmative action programs whose aim is to break down or eliminate the continuing effects of such segregation and discrimination, on the otherrepresents a serious distortion of history and does a grave disservice to the sincerely held views of a significant segment of our populace. As is demonstrated by the numerous and lengthy past judicial decisions that have considered race- and gender-conscious affirmative action programs, the legal questions posed by such programs have been widely understood as difficult and close, but the majority opinion's presentation does not do justice to the legal and historical arguments that have been articulated on both sides of the issue. In this respect, as well, I believe the majority opinion's approach cannot help but detract from the persuasiveness and credibility of its ultimate ruling.
In the ballot pamphlet distributed to registered voters prior to the November 1996 election, the analysis prepared by the Legislative Analyst described as follows the effect of the adoption of Proposition 209: "This measure would eliminate state and local government affirmative action programs in the areas of public employment, public education, and public contracting to the extent these programs involve `preferential treatment' based on race, sex, color, ethnicity, or national origin. The specific programs affected by the measure, however, would depend on such factors as (1) court rulings on what types of activities are considered `preferential treatment' and (2) whether federal law requires the continuation of certain programs." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) Legis. Analyst's analysis of Prop. 209, p. 30, italics added (Ballot Pamphlet).) The issue presented by this case is whether the particular affirmative action program here at issue "discriminates against" or "grants preferential treatment to" any individual or group on the basis of race or gender within the meaning of article I, section 31.
To resolve that question, it is unnecessary to venture back to the beginnings of our nation's history, as the majority opinion does. Instead, I believe it is appropriate to turn first to the language of article I, section 31, and its contemporary background (as reflected in the ballot pamphlet materials that were before the voters when they were considering the measure), and then to review the specifics of the city's challenged affirmative action program to determine whether the program violates this state constitutional provision.

II
Article I, section 31, subdivision (a)the principal substantive provision of the initiative measureprovides in full: "The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." Subdivision (f) of section 31 provides in turn: "For purposes of this section, `State' shall include, but not necessarily be limited to, the State itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the State."[2]
*685 The city acknowledges that the provisions of article I, section 31, are applicable to the recently adopted public contracting affirmative action program that is challenged in this case. The city maintains, however, that the challenged aspects of its affirmative action program do not "discriminate against" or "grant preferential treatment to" any individual or group on the basis of the enumerated characteristics, as these quoted terms are used in article I, section 31. That constitutional measure contains no express definition of the terms "discriminate against" or "grant preferential treatment to" as used in the section, and, in deciding how that language properly should be interpreted, it is appropriate to consider the material relating to Proposition 209 contained in the ballot pamphlet that was distributed to all voters prior to the election to determine whether that material provides any guidance as to how the voters are likely to have understood the meaning and effect of these terms. (See Ballot Pamp., supra, pp. 30-33.)[3]
I begin with the item in the ballot pamphlet materials that voters are most likely to have viewed as objective and impartial and to have consulted as a reliable indicator of the proposition's meaning and effectthe in-depth analysis of Proposition 209 prepared by the Legislative Analyst. (See Elec.Code, § 9087.)[4] Past cases establish that a court properly may look to the analysis of the Legislative Analyst in determining the voters' intent. (See, e.g., Legislature v. Eu (1991) 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309; Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 245-246, 149 Cal.Rptr. 239, 583 P.2d 1281.)
The initial section of the Legislative Analyst's analysis of Proposition 209, entitled "Background," reads in full: "The federal, state, and local governments run many programs intended to increase opportunities for various groupsincluding women and racial and ethnic minority groups. These programs are commonly called `affirmative action' programs. For example, state law identifies specific goals for the *686 participation of women-owned and minority-owned companies on work involved with state contracts. State departments are expected, but not required, to meet these goals, which include that at least 15 percent of the value of contract work should be done by minority-owned companies and at least 5 percent should be done by women-owned companies. The law requires departments, however, to reject bids from companies that have not made sufficient 'good faith efforts' to meet these goals.
"Other examples `of affirmative action programs include:
" Public college and university programs such as scholarship, tutoring, and outreach that are targeted toward minority or women students.
" Goals and timetables to encourage the hiring of members of `underrepresented' groups for state government jobs.
" State and local programs required by the federal government as a condition of receiving federal funds (such as requirements for minority-owned business participation in state highway construction projects funded in part with federal money)." (Ballot Pamp., supra, Legis. Analyst's analysis of Prop. 209, p. 30.)
After setting forth this background, the analysis goes on to describe the proposal embodied in Proposition 209: "This measure would eliminate state and local government affirmative action programs in the areas of public employment, public education, and public contracting to the extent these programs involve `preferential treatment' based on race, sex, color, ethnicity, or national origin. The specific programs affected by the measure, however, would depend on such factors as (1) court rulings on what types of activities are considered `preferential treatment' and (2) whether federal law requires the continuation of certain programs." (Ballot Pamp., supra, Legis. Analyst's analysis of Prop. 209, p. 30, italics added.) Although this passage makes it clear that were the proposition to be adopted, a court applying the measure would be required to determine whether or not a specific affirmative action program or policy granted "preferential treatment," this initial passage does not identify any criteria, or provide any examples, to aid in determining that question.
Subsequent passages of the Legislative Analyst's analysis, however, provide more guidance on this point. In discussing the potential fiscal effect of the passage of Proposition 209, the analysis contains separate sections discussing the measure's effect upon state and local programs in the areas of (1) public employment and contracting, (2) public schools and community colleges, and (3) the University of California and the California State University. Each section identifies some types of affirmative action programs that, according to the analysis, likely would be affected by the passage of the proposition.
With regard to public employment and contracting, the analysis states: "The measure would eliminate affirmative action programs used to increase hiring and promotion opportunities for state or local government jobs, where sex, race, or ethnicity are preferential factors in hiring, promotion, training, or recruitment decisions. In addition, the measure would eliminate programs that give preference to women-owned or minority-owned companies on public contracts. Contracts affected by the measure would include contracts for construction projects, purchases of computer equipment, and the hiring of consultants.... [¶] The elimination of these programs would result in savings to the state and local governments. These savings would occur for two reasons. First, government agencies no longer would incur costs to administer the programs. Second, the prices paid on some government contracts would decrease. This would happen because bidders on contracts no longer would need to show `good faith efforts' to use minority-owned or women-owned subcontractors. Thus, state and local governments would save money to the extent they otherwise would have rejected *687 a low bidderbecause the bidder did not make a `good faith effort'and awarded the contract to a higher bidder." (Ballot Pamp., supra, Legis. Analyst's analysis of Prop. 209, p. 31.)
With regard to public schools and community colleges, the analysis states that "the measure could eliminate, or cause fundamental changes to, voluntary desegregation programs run by school districts" (Ballot Pamp., supra, Legis. Analyst's analysis of Prop. 209, p. 31, italics omitted), observing that "[e]xamples of desegregation spending that could be affected by the measure include the special funding given to (1) `magnet' schools (in those cases where race or ethnicity are preferential factors in the admission of students to the schools) and (2) designated `racially isolated minority schools' that are located in areas with high proportions of racial or ethnic minorities.... [¶] In addition, the measure would affect a variety of public school and community college programs such as counseling, tutoring, outreach, student financial aid, and financial aid to selected school districts in those cases where programs provide preferences to individuals or schools based on race, sex, ethnicity, or national origin...." (Ibid.)
Finally, with regard to the University of California and the California State University, the analysis states: "The measure would affect admissions and other programs at the state's public universities. For example, the California State University (CSU) uses race and ethnicity as factors in some of its admissions decisions. If this initiative is passed by the voters, it could no longer do so.... [¶] Both university systems also run a variety of assistance programs for students, faculty, and staff that are targeted to individuals based on sex, race, or ethnicity. These include programs such as outreach, counseling, tutoring, and financial aid. The two systems spend over $50 million each year on programs that probably would be affected by passage of this measure." (Ballot Pamp., supra, Legis. Analyst's analysis of Prop. 209, p. 31.)
One additional passage of the Legislative Analyst's analysis also sheds light upon the voters' likely understanding and intent with regard to the types of affirmative action programs that would be affected by the measure. After observing that its calculations suggest that the measure could affect state and local programs that currently cost well in excess of $125 million annually, the analysis cautions that the actual amount of this spending that might be saved as a result of the passage of the measure could be considerably less than that amount for a variety of reasons, including the circumstance that "some programs we have identified as being affected might be changed to use factors other than those prohibited by the measure. For example, a high school outreach program operated by the UC [University of California] or the CSU [California State University] that currently uses a factor such as ethnicity to target spending could be changed to target instead high schools with low percentages of UC or CSU applications." (Ballot Pamp., supra, Legis. Analyst's analysis of Prop. 209, p. 31.)
In addition to the analysis of Proposition 209 prepared by the Legislative Analyst, the ballot pamphlet contained arguments in favor of and against Proposition 209 as well as accompanying rebuttal arguments submitted by the proponents and the opponents of the proposition. As a general matter, of course, ballot pamphlet arguments are intended as advocacy pieces, and voters undoubtedly are aware that such arguments may tend to overstate or exaggerate the benefits or detriments of a proposition and often are written in broad rhetorical terms that do not necessarily reflect the specific language or effect of the measure itself. As a consequence, a court must be cautious in considering such arguments and in attempting to gauge what weight the arguments properly should bear in the court's interpretation of a proposition's language. Nonetheless, because *688 the pro and con arguments are part of the materials that were presented to the voters in the ballot pamphlet, it is appropriate to take note of the arguments to the extent they speak to the question before us. (See, e.g., Legislature v. Eu, supra, 54 Cal.3d 492, 505, 286 Cal.Rptr. 283, 816 P.2d 1309.)
The argument in favor of Proposition 209 begins: "A generation ago we did it right. We passed civil rights laws to prohibit discrimination. But special interests hijacked the civil rights movement. Instead of equality, governments imposed quotas, preferences, and set-asides. [¶] Proposition 209 is called the California Civil Rights Initiative because it restates the historic Civil Rights Act and proclaims simply and clearly: `The state shall not discriminate against, or grant preferential treatment to, any individual or group, on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.'" (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32.) The argument in favor of Proposition 209 goes on to state: "Today, students are being rejected from public universities because of their RACE. Job applicants are turned away because their RACE does not meet some `goal' or `timetable.' Contracts are awarded to high bidders because they are of the preferred RACE. [¶] That's just plain wrong and unjust. Government should not discriminate. It must not give a job, a university admission, or a contract based on race or sex. Government must judge all people equally, without discrimination." The argument further states: "Discrimination is costly in other ways. Government agencies throughout California spend millions of your tax dollars for costly bureaucracies to administer racial and gender discrimination that masquerade as `affirmative action.' They waste much more of your money awarding highbid contracts and sweetheart deals based not on the low bid, but on unfair set-asides and preferences." (Ibid.) Finally, the argument states: "Real `affirmative action' originally meant no discrimination and sought to provide opportunity. That's why Proposition 209 prohibits discrimination and preferences and allows any program that does not discriminate, or prefer, because of race or sex, to continue. [¶] The only honest and effective way to address inequality of opportunity is by making sure that all California children are provided with the tools to compete in our society. And then let them succeed on a fair, colorblind, race-blind, gender-blind basis." (Ibid.) As these excerpts indicate, although the argument in favor of Proposition 209 identified some types of affirmative action programs at which the measure was directed, the argument did not purport to define with any degree of specificity the factors that should be considered in determining whether a program "discriminates against" or "grants preferential treatment to" an individual or group on the basis of the prohibited characteristics.
In urging voters to vote against the proposition, the argument against Proposition 209 states: "California law currently allows tutoring, mentoring, outreach, recruitment, and counseling to help ensure equal opportunity for women and minorities. Proposition 209 will eliminate affirmative action programs like these that help achieve equal opportunity for women and minorities in public employment, education, and contracting." The argument asserts that "[t]he initiative's language is so broad and misleading that it eliminates equal opportunity programs including: [¶] [1] tutoring and mentoring for minority and women students; [¶] [2] affirmative action that encourages the hiring and promotion of qualified women and minorities; [¶] [3] outreach and recruitment programs to encourage applicants for government jobs and contracts; and [¶] [4] programs designed to encourage girls to study and pursue careers in math and science." (Ballot Pamp., supra, argument against Prop. 209, p. 33.)
*689 In the rebuttal to the argument against Proposition 209, the proponents of the measure took issue with the opponents' characterization of the scope of the initiative, stating: "Don't let them change the subject. Proposition 209 bans discrimination and preferential treatmentperiod. Affirmative action programs that don't discriminate or grant preferential treatment will be UNCHANGED. Programs designed to ensure that all personsregardless of race or genderare informed of opportunities and treated with equal dignity and respect will continue as before. [¶] Note that Proposition 209 doesn't prohibit consideration of economic disadvantage. Under the existing racial-preference system, a wealthy doctor's son may receive a preference for college admission over a dishwasher's daughter simply because he's from an `underrepresented' race. THAT'S UNJUST. The state must remain free to help the economically disadvantaged, but not on the basis of race or sex." (Ballot Pamp., supra, rebuttal to argument against Prop. 209, p. 33.)
This overview of the ballot pamphlet materials relating to Proposition 209 makes several points clear. First, the measure's principal purpose clearly was to limit the types of affirmative action programs that governmental entities could employ in three areaspublic employment, public education, and public contracting. Second, the measure was not intended to preclude all governmental affirmative action programs within these areas, but rather was intended to prohibit only those affirmative action programs that discriminate against or grant preferential treatment to any individual or group on the basis of race or gender. Third, although neither article I, section 31, nor the accompanying ballot materials, expressly define the terms "discriminate against" or "grant preferential treatment to," the ballot materials identify a variety of affirmative action programs, then currently employed by governmental entities, that it was anticipated probably would be prohibited were the initiative measure to be adopted. These examples afford helpful guidance in determining how the language of article I, section 31, should be interpreted in order to effectuate the voters' intent.
As already noted, the city's basic contention is that the affirmative action measures at issue in this case do not discriminate against or grant preferential treatment to any individual or group within the meaning of article I, section 31. To resolve that question, it is necessary to examine the specifics of the program at issue.

III
In the wake of the passage of Proposition 209, the City of San Jose revised its prior public contracting affirmative action program by adopting a new program incorporating a number of elements. Only a portion of the city's program is challenged in this case, but it is useful to review the overall program in order to place the challenged provisions in context.
As part of its revised public contracting affirmative action program, the city itself assumed a greater and more active role in conducting a variety of general outreach activities in order to make information about bidding opportunities on public contracts more available and accessible to all contractors and subcontractors in the community. The city's current general outreach efforts include the following actions: (1) The city places the legal "Notice to Contract" in two local newspapers of general circulation, the San Jose Mercury News and the San Jose Post Record. (2) The city also places notices of the solicitation of bids for each project in all local builders' exchanges, trade papers, and contractor and subcontractor organization papers. (3) In addition, the city places information in local builders' exchanges and other locations, indicating which general contractors are intending to bid a particular project and are soliciting bids from subcontractors. (4) The city posts on the Internet additional information *690 on the projects that are out to bid and on the general contractors that are soliciting subcontract bids. (5) Finally, the city operates a "Bid Hotline" to provide information on projects out to bid.
In addition to these general outreach measures that are conducted by the city itself to increase knowledge of and access to the public contracting process, the city determined thatin light of an earlier study of the local public contracting process that documented a historical pattern of discrimination by prime contractors against minority-owned and women-owned subcontractors (referred to as MBE and WBE subcontractors) with regard to public contracts awarded by the cityit was appropriate to adopt a "Nondiscrimination/ Nonpreferential Treatment Program." This program imposes a number of requirements on prime contractors that wish to submit bids on public works construction contracts having a cost estimate in excess of $50,000.
First, the program requires each prime subcontractor to submit, along with its bid, a signed statement attesting that "[i]n listing subcontractors in this bid, I have not discriminated against or given any preference to any firm based on race, sex, color, age, religion, sexual orientation, disability, ethnicity, or national origin" and acknowledging that any such discrimination or preference would violate a city ordinance. Second, to more particularly address the historical discrimination against MBE/ WBE subcontractors, the program requires all prime contractors to satisfy a separate requirement by providing either "Documentation of Outreach" or "Documentation of Participation." It is the legal validity of these two componentsthe Documentation of Outreach component and the Documentation of Participation componentto which the challenge in this case is directed.
In order to satisfy the Documentation of Outreach option, a prime contractor must send written notice to not less than four MBE/WBE subcontractors in each appropriate trade area identified for the project, informing the notified subcontractors of the prime contractor's interest in bidding on the contract. This notice must be sent to the MBE/WBE subcontractors at least 10 days prior to the opening of bids. In addition, the prime contractor must follow up the written notice by contacting, or by making at least three attempts to contact, each of the MBE/WBE subcontractors to determine whether the subcontractor is interested in participating in the project. Finally, if any MBE/WBE subcontractor expresses interest in participating, the prime contractor must negotiate in good faith with the subcontractor and may not unjustifiably reject any bid prepared by an MBE/WBE subcontractor.[5] Under the program, a prime contractor need submit with its bid only copies of the required written notices that it has provided to the requisite number of MBE/WBE subcontractors. Although the program also requires the prime contractor to document its compliance with the remaining requirements of this option (i.e., the follow-up contacts with MBE/WBE subcontractors, and the contractor's reason for rejecting a proposal made by the MBE/ WBE subcontractors it has contacted), that additional documentation need not be submitted with the prime contractor's bid and need only be produced by the prime contractor in the event of a subsequent investigation by the city.
As an alternative to fulfilling the demands of the Documentation of Outreach option, a prime contractor instead may satisfy the requirements of the Documentation *691 of Participation component. Under this option, for each public works construction contract that falls within the reach of the Nondiscrimination/ Nonpreferential Treatment Program, the city's Office of Equality Assurance "establishes, as an evidentiary presumption," the percentage of MBE/WBE firms "that would be expected to be included in the Base Bid ... in the absence of discrimination." A prime contractor satisfies the Documentation of Participation option by listing in its bid a sufficient number of MBE/WBE subcontractors to satisfy this "evidentiary presumption." If a prime contractor decides to use a sufficient number of MBE/WBE subcontractors in its bid to meet the figure established by the city, the prime contractor is not required either to undertake or to document any steps with regard to outreach.
As already noted, the legal challenge in this case is directed only to the Documentation of Outreach or Documentation of Participation elements of the city's program. The city maintains that neither of these elements "discriminates against" or "grants preferential treatment to" any subcontractor within the meaning of article I, section 31. I address each component separately, beginning with the Documentation of Participation.

IV
With regard to the Documentation of Participation component, plaintiff contends that this feature of the city's program operates in a fashion similar to a set-aside or quota and clearly is invalid under article I, section 31. The city, by contrast, defends the participation option as an appropriate means of establishing a presumption of nondiscrimination that warrants relieving a contractor of the obligations imposed by the outreach component. In support of its position, the city maintains that the participation component, by utilizing an evidentiary presumption, is analogous to affirmative action programs that have been found to be permissible under Title VII. (See, e.g., Associated Pennsylvania Constructors v. Jannetta (M.D.Pa.1990) 738 F.Supp. 891, 892-893.) As I shall explain, I agree with plaintiffs claim that the Documentation of Participation component grants "preferential treatment" within the meaning of article I, section 31.
To begin with, the city's reliance upon the similarity of the participation component to programs that have been found permissible under Title VII clearly is without merit. Although the city points to a few passages in the ballot arguments in favor of Proposition 209 that it suggests support the position that article I, section 31, should be interpreted consistently with Title VII,[6] in reality, as explained below, the language of article I, section 31, differs significantly from that of Title VII. Indeed, the entire background of article I, section 31as reflected in the ballot pamphlet materialsdemonstrates that the principal purpose of Proposition 209 was to prohibit governmental entities in California, in the areas of public employment, public education, and public contracting, from utilizing many of the kinds of affirmative action programs that had been held permissible under Title VII.
By their explicit terms, the principal statutory provisions of Title VII prohibit employers and labor unions only from "discriminat[ing] against" persons on the basis of race, color, religion, sex or national origin; these provisions do not refer specifically to granting preferential treatment to persons on the basis of race or *692 gender. (42 U.S.C. §§ 2000c-2(a), 2000c-2(d).)[7] In Steelworkers v. Weber, supra, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (Weber), the United States Supreme Court relied in part on the absence in Title VII of an explicit statutory prohibition on granting preferential treatment on the basis of race in concluding that Title VII should not be interpreted to bar private employers from voluntarily implementing affirmative action programs that rely upon race-conscious preferences to attempt to overcome a substantial disparity in employment positions from which minorities and women historically have been excluded. As noted by the court in Weber, although the principal provisions of Title VII refer only to discrimination and not to preferential treatment, a separate provision of Title VII specifically addresses the question of preferential treatment, and provides simply that "[n]othing contained in this subchapter shall be interpreted to require any employer ... to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer...." (42 U.S.C. § 2000c-2(j), italics added.) Observing that "[h]ad Congress meant to prohibit all race-conscious affirmative action, as respondent urges, it easily could have ... provid[ed] that Title VII would not require or permit racially preferential integration efforts" (443 U.S. at p. 205, 99 S.Ct. 2721, italics in original), and noting that this latter provision "does not state that `nothing in Title VII shall be interpreted to permit' voluntary affirmative efforts to correct racial imbalances" (id. at p. 206, 99 S.Ct. 2721, italics in original), the court's opinion in Weber concluded that "[t]he natural inference is that Congress chose not to forbid all voluntary race-conscious affirmative action." (Ibid.) Accordingly, the high court ultimately held in Weber "that Title VII's prohibition ... against racial discrimination does not condemn all private, voluntary, race-conscious affirmative action plans." (Id. at p. 208, 99 S.Ct. 2721.)
The proponents and drafters of Proposition 209 unquestionably intended to incorporate into the California Constitution a rule different from that which the United States Supreme Court in Weber concluded is embodied in Title VII. Unlike Title VII, article I, section 31, expressly prohibits governmental entities from either "discriminating] against" or "grant[ing] preferential treatment to" any person or group on the basis of race or gender. Thus, contrary to plaintiffs argument, the circumstance that a particular type of affirmative action program has been found permissible under Title VII does not provide a sound basis for concluding that the program also is permissible under article I, section 31.
Looking to the specifics of the particular Documentation of Participation component at issue, it appears clear that in practice this option will operate to create a strong incentive for prime contractors, in selecting among subcontractors, to grant preferential treatment to at least some MBE and/or WBE subcontractors in order to meet the percentage figure specified by *693 the city. A prime contractor will be encouraged to follow such a course both in order to avoid the necessity of complying with the somewhat burdensome procedural requirements of the outreach component and also in order to avoid the potentially significant adverse sanctions (such as the loss of the right to bid on city projects for a specified period of time) that might be imposed under the outreach option if a contractor is found to have unjustifiably rejected the proposal of an MBE/WBE subcontractor.
Although the city maintains that, by requiring the contractor to certify that it has neither discriminated against nor granted preference to any firm on the basis of race or gender, its program guards against the risk that a prime contractor might grant preferential treatment to an MBE/WBE subcontractor, in view of the practical difficulty of policing such self-serving representations it is unrealistic to suggest that the certification process affords an adequate safeguard. When the participation component is viewed from a practical and commonsense perspective, I believe it is clear that the Documentation of Participation component is likely to operate in a manner analogous to a prescribed set-aside or goalone of the basic types of affirmative action measures at which article I, section 31, was directed. Accordingly, I conclude that the Documentation of Participation component violates article I, section 31, because it effectively operates to grant "preferential treatment" to subcontractors on the basis of race or gender.

V
In defending the validity of the alternative Documentation of Outreach component, the city maintains that the term "preferential treatment" in article I, section 31, should be interpreted to preclude only preferential treatment in the actual selection process itself, as occurs, for example, in programs that designate race or gender a "plus" factor in evaluating candidates or in programs that establish goals or set-asides specifying the percentage or number of applicants or candidates expected to be hired for a job, awarded a government contract, or admitted to a school. The city asserts that the term "preferential treatment" should not be interpreted to apply to outreach programs (including "targeted" outreach programs) that simply expand the pool of candidates or applicants who are provided access to opportunities in public employment, public contracts or a public school but that do not afford preferential treatment on the basis of race or gender in the actual selection process itself.
In support of its position, the city heavily relies upon Lungren v. Superior Court (1996) 48 Cal.App.4th 435, 442, 55 Cal. Rptr.2d 690 (Lungren). The Lungren decision, which was handed down three months prior to the vote on Proposition 209, involved a preelection challenge to the wording of the Attorney General's title and summary of Proposition 209 that was to appear on the election ballot. In Lungren, the challengers contended that the Attorney General's summary was potentially misleading because it simply tracked the language of Proposition 209 and did not specifically state that the measure would prohibit affirmative action programs conducted by state and local government. The trial court agreed with the challengers that the summary was misleading in failing to "`reflect that the chief purpose of the measure is to prohibit affirmative action programs by public entities that are inconsistent with the prohibition in the measure' " (48 Cal.App.4th at p. 437, 55 Cal. Rptr.2d 690) and ordered a change in the ballot title and summary. The Court of Appeal, however, acting in an expedited writ proceeding, overturned the trial court's determination, concluding that the failure to include the term "affirmative action" in the Attorney General's title and summary of Proposition 209 did not render the title or summary improper or misleading.
*694 In reaching its conclusion in Lungren, the Court of Appeal observed that the term "affirmative action" is ambiguous and that "[m]ost definitions of the term would include not only the conduct which Proposition 209 would ban, i.e., discrimination and preferential treatment, but also other efforts such as outreach programs. [Citations.] Accordingly, any statement to the effect that Proposition 209 repeals affirmative action programs would be overinclusive and hence `false and misleading.'" (Lungren, supra, 48 Cal.App.4th at p. 442, 55 Cal.Rptr.2d 690, italics added.)
The city, seizing upon the italicized language in the above quoted passage, asserts that the Court of Appeal's decision in Lungren constitutes a definitive judicial ruling that no outreach program falls within the reach of article I, section 31. The city argues that when the voters thereafter approved Proposition 209, they must be presumed, under established legal principles, to have done so in light of the interpretation of the measure adopted in Lungren. Accordingly, the city argues that article I, section 31, should be interpreted as inapplicable to any outreach program.
In my view, the city's argument plainly rests on an inaccurate and overbroad reading of the language used by the Court of Appeal in Lungren. In stating that most definitions of affirmative action would include not only programs that discriminate against or grant preferential treatment, but also outreach programs, Lungren did not suggest that no outreach program properly could be found to discriminate against or grant preferential treatment within the meaning of article I, section 31. Reasonably interpreted, the quoted passage in Lungren simply explains that because there are some affirmative action programs, including some outreach programs, that do not involve discrimination or preferential treatment on the basis of race or gender, a title and summary of Proposition 209 that indicated the initiative generally would repeal affirmative action programs would itself be overbroad and misleading. The quoted passage in Lungren does not refer to, much less purport to decide, whether a "targeted outreach" program, i.e., an outreach program directed solely to individuals or groups on the basis of race or gender, would constitute discrimination or preferential treatment within the meaning of the proposition.
The city maintains, however, that it is disingenuous to suggest that a program that does not involve race-conscious or gender-conscious components would be viewed or understood to be an "affirmative action" program. I strongly disagree. The term "affirmative action" has been employed in a general way to describe a great variety of proactive programs instituted by an entity in an attempt to remedy segregated programs or to overcome a legacy of discrimination or exclusion. (See, e.g., Holzer & Neumark, Assessing Affirmative Action (Sept.2000) 38 J. Econ. Literature 483, 484.) Such pro-active efforts need not necessarily involve race-conscious or gender-conscious measures, but rather can include efforts relating to broad, general outreach to the entire community, including portions of the community that have not been solicited or granted access in the past. The outreach program that was before this court in Domar Electric, Inc. v. City of Los Angeles (1994) 9 Cal.4th 161, 36 Cal.Rptr.2d 521, 885 P.2d 934, requiring contractors bidding on public contracts to undertake "reasonable good faith outreach to all types of subcontractor enterprises" (id. at p. 174, 36 Cal. Rptr.2d 521, 885 P.2d 934), provides a good example of a general, nontargeted outreach program that ordinarily would be considered an affirmative action program.
Accordingly, I conclude that the Court of Appeal's opinion in Lungren, supra, 48 Cal.App.4th 435, 55 Cal.Rptr.2d 690, does not support the city's claim that the Documentation of Outreach component of its program cannot properly be considered as granting preferential treatment under article I, section 31, simply because its provisions do not require a contractor *695 to grant preferential treatment to MBE/WBE's in the selection process but instead impose only an obligation of targeted outreach.
Indeed, contrary to the city's suggestion that the electors who voted in favor of Proposition 209 should be presumed to have understood that the passage of the measure would not affect the validity of targeted outreach efforts in the areas public employment, public education, and publiccontracting covered by the measure, the materials relating to Proposition 209 contained in the ballot pamphlet provided a rather clear indication that outreach efforts that are targeted toward individuals or groups on the basis of race or gender were likely to fall within the reach of the proposition.
As noted above, in discussing the probable fiscal effect of the passage of Proposition 209, the analysis prepared by the Legislative Analyst discussed a number of then existing affirmative action programs that likely would be affected by the measure. Regarding the effect on public schools and community colleges, the analysis stated in part: "[T]he measure would affect a variety of public school and community college programs such as counseling, tutoring, outreach, student financial aid, and financial aid to selected school districts in those cases where the programs provide preferences to individuals or schools based on race, sex, ethnicity, or national origin. Funds spent on these programs total at least $15 million each year." (Ballot Pamp., supra, Legis. Analyst's analysis of Prop. 209, p. 31, italics added.) Similarly, in discussing the effect of the measure on the University of California and the California State University, the analysis stated: "Both university systems also run a variety of assistance programs for students, faculty, and staff that are targeted to individuals based on sex, race, or ethnicity. These include programs such as outreach counseling, tutoring, and financial aid. The two systems spend over $50 million each year on programs that probably would be affected by passage of this measure." (Ibid., italics added.) Finally, in cautioning that its estimate of the total savings that would result from passage of the initiative could be considerably less for a variety of reasons, the analysis pointed to the following as one such circumstance: "[S]ome programs we have identified as being affected might be changed to use factors other than those prohibited by the measure. For example, a high school outreach program operated by the UC or the CSU that currently uses a factor such as ethnicity to target spending could be changed to target instead high schools with low percentages of UC or CSU applications." (Ibid., italics added.)
In light of the analysis of Proposition 209 contained in the ballot pamphlet, it is clear that the voters reasonably would have believed that an outreach program targeted to specific individuals or groups on the basis of their race or gender would be considered a program that grants preferential treatment within the meaning of article I, section 31. Interpreting the language of article I, section 31, to effectuate the voters' intent, we must conclude that an outreach program directed to an audience on the basis of its members' race or gender constitutes a program that grants preferential treatment for purposes of article I, section 31.
In view of this conclusion, it is clear that the Documentation of Outreach component that is challenged in this case violates the newly enacted constitutional provision. As noted, the outreach component in question places an obligation on prime contractors to solicit bids from, and make follow-up contacts to, a specified number of MBE or WBE subcontractors, but the provision places no similar obligation on prime contractors to undertake outreach efforts to non-MBE or non-WBE subcontractors. This aspect of the outreach component in itself grants preferential treatment to subcontractors on the basis of race and gender. Moreover, the city's outreach component contains an additional feature that requires a prime contractor to negotiate in good faith withand to justify any rejection *696 of an offer made byany one of the MBE/WBE subcontractors that expresses an interest in participating in the project, while the provision places no similar requirements upon a prime contractor with regard to proposals made by a non-MBE or non-WBE subcontractor. These additional features of the outreach component similarly grant preferential treatment to subcontractors on the basis of race or gender, and indeed, as a practical matter, may well create a significant incentive for a prime contractor to grant preferential treatment to an MBE/WBE subcontractor that expresses interest in participating in the project, in order to avoid a claim that the contractor's negotiation or justification for rejection was inadequate.
Accordingly, I conclude that the Documentation of Outreach component of the city's program is invalid under article I, section 31.

VI
Although this court has concluded that the two components of the city's public contracting program that are challenged in this case violate article I, section 31, this determination should not obscure the important point that this constitutional provision does not prohibit all affirmative action programs or preclude governmental entities in this state from initiating a great variety of pro-active steps in an effort to address the continuing effects of past discrimination or exclusion, and to extend opportunities in public employment, public education, and public contracting to all members of the community.
Indeed, the numerous additional features of the public contracting outreach program that the city recently has put in place, and that have not been challenged in this proceeding, provide ready examples of just a few of the many forms of affirmative action that clearly are consistent with the provisions of article I, section 31. Expanding advertising of public contract bidding opportunities in newspapers of general circulation and special trade journals, establishing public contract hotlines, and creating Web sites to disseminate information to previously nonparticipating subcontractors in order to facilitate the submission of proposals to prime contractors who are contemplating submitting a bid on a projectall these are permissible means by which a governmental entity may attempt to expand the pool of persons to whom public contracts are awarded. In addition, there are many other strategies that may be implemented by governmental entities that similarly appear to present no danger of running afoul of the precepts embodied in article I, section 31, such as dividing large public contracts into smaller segments in order to facilitate participation by new or more modest enterprises.
Furthermore, a public contracting program that imposes an obligation on a prime contractor to engage in reasonable, good faith outreach to all types of subcontractor enterprises in a community, like the outreach program upheld by this court prior to the adoption of Proposition 209 in Domar Electric, Inc. v. City of Los Angeles, supra, 9 Cal.4th 161, 36 Cal.Rptr.2d 521, 885 P.2d 934, represents another example of a permissible affirmative action outreach program that does not discriminate against or grant preferential treatment on the basis of race or gender.[8] As *697 the proponents of Proposition 209 made clear in their rebuttal to the argument against the initiative measure: "Proposition 209 bans discrimination and preferential treatmentperiod. Affirmative action programs that don't discriminate or grant preferential treatment will be UNCHANGED. Programs designed to ensure that all personsregardless of race or genderare informed of opportunities and treated with equal dignity and respect will continue as before." (Ballot Pamp., supra, rebuttal to argument against Prop. 209, p. 33, italics added.)

VII
For the reasons set forth above, I conclude that the judgment of the Court of Appeal should be affirmed.
WERDEGAR, J., concurs.
*698 
*699 
*700 
*701 
NOTES
[1] An MBE is defined as a business with at least 51 percent ownership or control by one or more minority persons, as the City's municipal code defines "minority." A WBE must be 51 percent owned by a woman or women, who also control and operate it.
[2] Also by local ordinance, a contractor may not "discriminate or grant preferential treatment on the basis of race, sex, color, age, religion, sexual orientation, disability, ethnicity, or national origin, in the selecting of any subcontractor for work on a city or agency contract." (San Jose Mun.Code, § 4.08.070, subd. B.) Prime contractors submitting bids on city projects must certify they have not unlawfully discriminated.
[3] The City apparently interprets these latter requirements as prohibiting a prime contractor from rejecting a subcontractor's proposal based upon race or sex. It is unclear, however, how it makes this determination.
[4] Section 31 proscribes discrimination and preferential treatment on the basis of sex as well as race. (See post, 101 Cal.Rptr.2d at p. 668, fn. 12, 12 P.3d at p. 1081, fn. 12.) Our preliminary discussion focuses on the development of legal and philosophical norms concerning governmental actions relating to race because the history of racial discrimination is the genesis of all we discuss here. At the same time, we do not ignore or discount the reality that women were long denied equality, albeit often for different reasons than racial or ethnic minorities. (See, e.g., Sanderson v. Niemann (1941) 17 Cal.2d 563, 569, 110 P.2d 1025 [by statute and decisional law husband had management and control of community property and must, with limited exceptions, bring all actions that concerned the community property]; Griffey v. Pacific Electric Ry. Co. (1922) 58 Cal.App. 509, 521, 209 P. 45 [married woman is "duty bound to follow her husband to any reasonable fit abode which he might select"]; Basler v. Sacramento Gas & Elec. Co. (1910) 158 Cal. 514, 518, 111 P. 530 [wife's personal injury action barred "if [her husband's] negligence contributed proximately to her injury (since under the laws of this state the recovery for her injuries is community property, in which the husband shares and over which he has control)"]; see also In the Matter of the Motion To Admit Miss Lavinia Goodell to the Bar of this Court (1875) 39 Wis. 232, 1875 WL 3615, * 8 [Wisconsin Supreme Court refused to admit first female applicant to the state bar, in part because the "peculiar qualities of womanhood . . . are surely not qualifications for forensic strife"].) While the struggle for racial equality is paradigmatic, it is not singular in its influence on the law.
[5] See also Loving v. Virginia (1967) 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (striking down state ban on interracial marriage; "The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States"); Anderson v. Martin (1964) 375 U.S. 399, 402, 84 S.Ct. 454, 11 L.Ed.2d 430 (invalidating state statute requiring designation of candidates' race on electoral ballots; "The vice ... [is] not in the resulting injury but in the placing of the power of the State behind a racial classification that induces racial prejudice at the polls"); Shelley v. Kraemer (1948) 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (finding Fourteenth Amendment violation in state court's enforcement of restrictive covenants); Buchanan v. Warley (1917) 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (invalidating statute forbidding Blacks and Whites from moving into a block where the greater number of residences were occupied by persons of the other race); but see Korematsu v. United States (1944) 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (upholding order excluding citizens of Japanese ancestry from their homes located in West Coast war area and requiring detention at relocation centers); Hirabayashi v. United States (1943) 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (upholding curfew imposed only against citizens of Japanese ancestry).
[6] Among other provisions, Title VII states: "It shall be an unlawful employment practice for an employer ... [¶] ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." (42 U.S.C. § 2000e-2(a)(1).)

Title VI of the Act provides in part: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." (42 U.S.C. § 2000d.)
Many of the floor debates and other legislative history materials reference both titles. (See, e.g., Bakke II, supra, 438 U.S. at p. 287, 98 S.Ct. 2733.)
[7] With respect to proving a violation of Title VII, the Supreme Court explained in McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (McDonnell Douglas ) that a complainant "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." If the complainant establishes a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." (Ibid.) If so, the complainant may counter with evidence the "stated reason for [his or her] rejection was in fact pretext." (Id. at p. 804, 93 S.Ct. 1817.)
[8] Senator Humphrey expressed similar views regarding the purpose and effect of title VI: "`[T]he bill has a simple purpose. That purpose is to give fellow citizensNegroesthe same rights and opportunities that white people take for granted.... It is no more than what our Constitution guarantees.' [Citation.]" (Bakke II, supra, 438 U.S. at p. 287, 98 S.Ct. 2733, fn. omitted.)
[9] A comparable evolution occurred in decisions involving equal protection challenges. Setting aside such holdings as Hughes v. Superior Court of California, supra, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985, and Brown v. Board of Education, supra, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, five members of the Supreme Court in Bakke II, supra, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, expressed the view that the Constitution will tolerate race-based state action intended to remedy the effects of past discrimination, even on behalf of individuals who did not personally suffer as a result. (See Bakke II, at pp. 316-319, 98 S.Ct. 2733 (lead opn. of Powell, J.); id. at pp. 324-326 & fn. 1, 98 S.Ct. 2733 (cone. & dis. opn. of Brennan, J., in which White, Marshall, and Blackmun, JJ., joined).)

Thereafter, in Wygant v. Jackson Board of Education (1986) 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (Wygant ), the court accepted the licitness of race-conscious remedies with the caveat "a public employer ... must ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted." (Id. at p. 277, 106 S.Ct. 1842; see also Adarand Constructors, Inc. v. Pena (1995) 515 U.S. 200, 236-237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (Adarand) [allowing a "narrowly tailored race-based remedy" in response to "lingering effects of racial discrimination against minority groups" by federal agencies]; Croson, supra, 488 U.S. at p. 509, 109 S.Ct. 706 ["Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise" and justify taking affirmative action to rectify the effects].) In United States v. Paradise (1987) 480 U.S. 149, 177, 107 S.Ct. 1053, 94 L.Ed.2d 203, the high court expressly approved a judicial decree that included a racial quota for future promotions by the Alabama Department of Public Safety. Because the order was narrowly tailored to redress "pervasive, systematic, and obstinate discriminatory conduct of the Department" (id. at p. 167, 107 S.Ct. 1053), it did not offend equal protection even though none of the beneficiaries had experienced promotional discrimination.
[10] California's Legislature was active in banning discrimination during this period as well. As early as 1939, state law prohibited racial discrimination on public works projects. (Lab.Code, § 1735, added by Stats. 1939, ch. 643, § 1, p.2068.) Beginning in 1959, the Unruh Civil Rights Act barred discrimination by "business establishments of every kind." (Civ.Code, §§ 51, 52, as amended by Stats.1959, ch. 1866, § 1, p. 4424.) In 1963, the Legislature passed the Rumford Fair Housing Act, which provided that "[t]he practice of discrimination because of race, color, religion, national origin, or ancestry ... is declared to be against public policy." (Health & Saf.Code, former §§ 35700-35744, added by Stats. 1963, ch. 1853, § 2, p. 3823, and repealed by Stats. 1980, ch. 992, § 8, p. 3166, and replaced by Stats. 1980, ch. 992, § 4, p. 3140, adding Gov.Code, § 12900 et seq.; see also Civ.Code, §§ 53, 782.)
[11] Neither did the court find a denial of equal protection under the federal or state Constitution. (Price, supra, 26 Cal.3d at pp. 277-285, 161 Cal.Rptr. 475, 604 P.2d 1365; see also DeRonde, supra, 28 Cal.3d at pp. 882-891, 172 Cal.Rptr. 677, 625 P.2d 220; Minnick v. Department of Corrections (1979) 95 Cal. App.3d 506, 519-523, 157 Cal.Rptr. 260.) Departing from the understanding it had articulated in Bakke I, supra, 18 Cal.3d at pages 48-63, 132 Cal.Rptr. 680, 553 P.2d 1152, the court relied substantially on its interpolation of the equal protection analysis in Bakke II, supra, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750. (Price, supra, 26 Cal.3d at pp. 278-283, 161 Cal.Rptr. 475, 604 P.2d 1365; see ante, 101 Cal.Rptr.2d at p. 664, fn. 9, 12 P.3d at p. 1078, fn. 9.)
[12] Section 31 further provides: "(b) This section shall apply only to action taken after the section's effective date.

"(c) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex which are reasonably necessary to the normal operation of public employment, public education, or public contracting.
"(d) Nothing in this section shall be interpreted as invalidating any court order or consent decree which is in force as of the effective date of this section.
"(e) Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the state.
"(f) For the purposes of this section, `state' shall include, but not necessarily be limited to, the state itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the State.
"(g) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national origin, as are otherwise available for violations of then-existing California antidiscrimination law.
"(h) This section shall be self-executing. If any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section."
[13] Contrary to the City's argument, this determination does not render "preferential treatment" surplusage. An overt act of discrimination against one person does not require the granting of preferential treatment to another. Preferential treatment may, but does not necessarily, involve overt discrimination. "`[Preferences' includes, at a minimum, programs or policies that use racial or gender classifications." (Coalition for Economic Equity v. Wilson (N.D.Cal.1996) 946 F.Supp. 1480, 1489, fn. 4 (Coalition I).)
[14] As used in our discussion of section 31, "race" includes color, ethnicity, and national origin.
[1] For convenience, in this opinion I shall use the phrase "race or gender" as a shorthand term that refers to all of the categories listed in article I, section 31i.e., "race, sex, color, ethnicity, or national origin." (Cal. Const., art. I, § 31, subd. (a).)
[2] Article I, section 31, reads in full:

"(a) The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.
"(b) This section shall apply only to action taken after the section's effective date.
"(c) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex which are reasonably necessary to the normal operation of public employment, public education, or public contracting.
"(d) Nothing in this section shall be interpreted as invalidating any court order or consent decree which is in force as of the effective date of this section.
"(e) Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State.
"(f) For the purposes of this section, `State' shall include, but not necessarily be limited to, the State itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the State.
"(g) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national origin, as are otherwise available for violations of then-existing California anti-discrimination law.
"(h) This section shall be self-executing. If any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section."
[3] The section of the ballot pamphlet relating to Proposition 209 is set forth in full in an appendix to this opinion. The text of Proposition 209, which was set forth in a separate section at the end of the ballot pamphlet, has been omitted from the appendix.
[4] Elections Code section 9087 provides in relevant part: "The Legislative Analyst shall prepare an impartial analysis of the measure describing the measure and including a fiscal analysis of the measure showing the amount of any increase or decrease in revenue or cost to state or local government. . . . The analysis shall be written in clear and concise terms, so as to be easily understood by the average voter, and shall avoid the use of technical terms wherever possible. The analysis may contain background information, including the effect of the measure on existing law and the effect of enacted legislation which will become effective if the measure is adopted, and shall generally set forth in an impartial manner the information the average voter needs to adequately understand the measure. . . ."
[5] Although the terms of the program do not further explain the circumstances under which a prime contractor will be found not to have negotiated in good faith or a contractor's rejection of an MBE/WBE subcontractor's proposal will be found to be unjustifiable, the record indicates that the city interprets these requirements simply as prohibiting a prime contractor from rejecting a subcontractor's proposal on the basis of race, gender, or one of the other prohibited bases.
[6] The city cites two brief excerpts from the proponents' arguments: (1) the statement in the argument in favor of Proposition 209 declaring that "Proposition 209 is called the California Civil Rights Initiative because it restates the historic Civil Rights Act..." (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32), and (2) a sentence contained in the rebuttal to the argument against Proposition 209 stating that "[a]nyone opposed to Proposition 209 is opposed to the 1964 Civil Rights Act." (Ballot Pamp., supra, rebuttal to argument against Prop. 209, p. 33.)
[7] Title 42 United States Code section 2000c-2(a), provides in relevant part: "It shall be an unlawful employment practice for an employer[¶] (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." (Italics added.)

Title 42 United States Code section 2000c-2(d), provides in relevant part: "It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship ... to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training." (Italics added.)
[8] As noted above, in addressing the fiscal effect of Proposition 209, the analysis by the Legislative Analyst stated that the amounts paid on some government contracts would decrease if the initiative were adopted, because "bidders on contracts no longer would need to show `good faith efforts' to use minority-owned or women-owned subcontractors. Thus, state and local governments would save money to the extent they otherwise would have rejected a low bidderbecause the bidder did not make a `good faith effort'and awarded the contract to a higher bidder." (Ballot Pamp., supra, Legis. Analyst's analysis of Prop. 209, p. 31.)

This comment cannot properly be interpreted to suggest that every affirmative action program that includes an outreach element requiring a good faith effort by a prime contractor would violate article I, section 31. The comment in the analysis relates solely to programs in which the required good faith effort is directed at individuals or firms on the basis of race or gender. Because article 1, section 31, prohibits only those actions that discriminate or grant preferential treatment to persons or groups on the basis of these prohibited categories, an outreach program (such as the program addressed in Domar) that is not based on those characteristics would not violate the constitutional provision, even if it contains a good faith effort component.